(Decided March 27th, 1895.)·

---

SAMANNA CROCKETT and Others *vs.* HARRY B. DAVIS, Executor, and Others.

*Wills—Testamentary Capacity—Evidence of Medical Men—Reasons for Opinions—Undue Influence—Sufficiency of Evidence.*

An attending physician is competent to testify as to the mental capacity of a testator, without first stating the facts and circumstances upon which his opinion is based.

The opinion of a medical expert on that subject is not only some evidence, but is generally very important evidence to go to the jury, particularly if he was well acquainted with the testator and attended him professionally.

But if a medical expert gives the reasons upon which his opinion is founded, and they are such as men of ordinary knowledge can weigh, and are, in the judgment of the Court, clear absurdities from which no rational inference can be deduced, then his opinion that the testator did not have mental capacity is not legally sufficient evidence to prove the same.

When the question was as to testamentary capacity *vel non*, a physician who was the son-in-law of the testatrix, and who had attended her professionally for a number of years, including the time when the will was made, testified that in his opinion·she was not then of sound and disposing mind, capable of executing a valid deed or contract; that a caveat to her late husband's will, filed shortly before she executed her own, had greatly excited her; that she was in bad health, forgetful, self-contradictory and could easily be persuaded to

do absurd things; that she suffered from chronic gastritis, which had weakened her mind, and that he could not remember all she said which produced that impression on him. Other witnesses testified that the testatrix was melancholy, weak, nervous and excitable. *Held*, that the reasons given by the physician for his opinion were not so inconclusive as to justify the Court in withdrawing the question of testamentary capacity from the consideration of the jury. ·

If the facts proved are such that a rational mind might in reason and fairness draw from them the conclusion sought to be established, it is the duty of the Court to submit the case to the jury.

Upon the trial of a caveat to a will, where one of the issues involved the question of undue influence, the evidence showed that the testatrix, who had children by two husbands, bequeathed the greater part of her property to her children by her second husband; that most of the property had been acquired by her own industry; that her relations with the children so excluded were of an affectionate character; that she lived eighteen months after making the will and never spoke of it to the caveators. There was no evidence that any of the legatees under the will knew that it had been made. *Held*, that these facts did not constitute any legally sufficient evidence of undue influence.

Appeal from the Superior Court of Baltimore City. The case is stated in the opinion of the Court. At the close of the evidence adduced on behalf of the caveators, the defendants offered the following prayers :

1 and 2. If the jury shall find from the evidence that Catherine Davis signed the will offered in evidence in the presence of the witnesses, Marcus Ritgert and John Shick, as testified to by them; and that said persons, at her request, in her presence and in the presence of each other, signed their names as witnesses to said will, then the verdict of the jury must be for the defendants on the first and seconds issues.

3. The defendants pray the Court to instruct the jury that no sufficient evidence has been offered to show that the will offered in evidence was procured by *undue influence*, and therefore the verdict of the jury must be for the defendants on the third issue.

4. The defendants pray the Court to instruct the jury that no sufficient evidence has been offered to show that

Catherine Davis, at the time she executed the will offered in evidence, was not of sound and disposing mind and capable of executing a valid deed and contract; and, therefore, the verdict of the jury must be for the defendants on the fourth issue.

The Court below (RITCHIE, J.) granted all of said prayers, and the verdict on the issues being for the defendants, the plaintiffs appealed.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, BRISCOE, ROBERTS and BOYD, JJ.

*S. S. Field* and *John F. Gontrum* (with whom was *Samuel Regester* on the brief), for the appellants.

If there was any evidence from which a rational mind might have found undue influence or incapacity, then the Court erred in withdrawing those issues from the jury. No matter how slight the Court may have considered the evidence, if there was any evidence *legally tending* to prove these issues, they should have been submitted to the jury. *Mayor & C. C.* v. *Williams*, 6 Md. 236, 267-8; *Morrison* v. *Whiteside*, 17 Md. 452; *Moore* v. *McDonald*, 68 Md. 340; *Weik* v. *Hiss*, 78 Md. 439; *C. & C. Co.* v. *Scally*, 27 Md. 589; *Clarke* v. *Dederick*, 31 Md. 148; *Green* v. *Ford*, 35 Md. 82.

As to capacity. Testator "must have capacity to comprehend the extent of his property and the nature of the claims of others, whom, by his will, he is excluding from all participation in that property." 1 *Redfield on Wills*, 4th ed. page 129. "It is not sufficient of itself that a testator should be able to describe his feelings or give correct answers to ordinary questions." *Davis* v. *Calvert*, 5 G. & J. 279. "It is not sufficient, *per se*, that he should be able to describe his feelings or to give suitable answers to ordinary questions. This he may do, and yet his mind may be too much diseased to enable him to dispose of his estate with understanding and discretion." From JUDGE WASHINGTON, charge to the jury in *Harrison* v. *Rowan*, 3 Wash. C. C.

586. " It is a great but not an uncommon error to suppose that because a person can understand a question put to him and can give a rational answer to such question, he is of perfect sound mind and is capable of making a will. * * In *Combe's case* the rule is laid down in these words: ' It was agreed by the Judges that same memory for the making of a will is not at all times when the party can answer to anything with sense, but he ought to have judgment to discern and to be of perfect memory, otherwise the will is void.' * * * So again, in the *Marquess of Winchester's case :* 'By the law it is not sufficient that the testator be of memory when he makes his will, to answer familiar and usual questions, but he ought to have a disposing memory, so as to be able to make a disposition of his estate with understanding and reason.' " SIR JOHN NICHOLL in *Marsh* v. *Tyrrell*, 2 Hagg. Ec. R. 84.

Several witnesses, including the attending physician, gave their opinions as to Mrs. Davis' mental condition at the date of the alleged will. Every witness who thus testified had known Mrs. Davis long and intimately, and saw her frequently during time about which they speak. The doctor married one of her daughters in 1863, and from 1868 to her death, in 1892, he lived near her and was her regular physician. No objection was made to the admission of these opinions in evidence, but upon the prayers, the Court swept them all aside, as well as the other evidence, and withdrew the case from the jury. In our judgment, this was a most remarkable invasion of the province of the jury. Laying out for a moment all the other evidence, we believe that the annals of judicial history, from the earliest times to the present, will not furnish *another* case where a Judge has instructed the jury that there was no evidence of incapacity, in the teeth of the direct, emphatic, uncontradicted, unimpeached testimony of the attending physician.

The rule requiring ordinary witnesses to state such facts as they can as the ground of their opinions " does not require them to describe what is not susceptible of descrip-

tion, nor to narrate facts enough to enable a jury to form an opinion from those alone. This would be impossible, and if it could be done, there would be no occasion for any opinion of the witness." *Beaubien* v. *Cicotte*, 12 Mich. 503 ; 2 *Redfield, Am. Cas., Wills*, 85.

Facts and circumstances must be stated to show that witness had sufficient opportunities of observing the party, to enable him to form a correct opinion of such party's mental condition, otherwise his opinion, if objected to, will not be admitted. " If the opportunity of forming a judgment has not been good, the opinion will be of little or no value." *Kerby* v. *Kerby*, 57 Md. 360.

But there is no precise rule as to just what opportunities of judging will qualify an ordinary witness to state his opinion. In *Waters* v. *Waters*, 35 Md., one "brief and casual conversation" on the only occasion witness ever met the party, was held not sufficient. On the other hand, in the leading case on this subject, a witness who had visited deceased once, and taken her directions for her will, was permitted to testify, *without giving* any special grounds for his opinion : "That he was impressed with the belief that as to her mental faculties, Mary Clary was in a state called childish." *Clary* v. *Clary*, 2 Iredell, 78. JUDGE GASTON's opinion in this case has been quoted and approved all over this country : *e. g.* in 7 Gill, 28 ; 111 U. S. 617; 6 Ga. 335; 16 Ala. 779 ; 12 Mich. 503 ; 76 Mo. 315.

In *Kerby* v. *Kerby*, 57 Md. 360, one witness, Mr. Clark, who had visited deceased, "he says a dozen times a year," was held, thereby qualified to give his opinion. See also *Norris* v. *State*, 16 Ala. 779, where opinions of a father and school teacher were ruled admissible, on the ground of their opportunities of judging. These authorities have been referred to as illustrating the rule upon the admissibility of such evidence, but are not important in this case, because the opinions given in this case were all admitted without objection, and thereby on this appeal, the *admissibility*

thereof is *concluded.* Cases *supra,* 7 G. & J. 80, and 11 Md. 101.

It does not necessarily follow that the opinion of a witness should be excluded, because he is unable to state everything upon which it is based; or that it should be totally disregarded because the facts actually stated may not justify the conclusion. *Stubbs* v. *Houston,* 33 Ala. 567.

Upon the question of undue influence, counsel relied upon: *Hiss* v. *Weik,* 78 Md. 439; *Davis* v. *Calvert,* 5 G. J. 300; *Moore* v. *McDonald,* 68 Md. 339; 1 *Redfield on Wills,* 518; *Schouler on Wills,* sec. 242, 238; *Beach on Wills,* sec. 113; *Herster* v. *Herster,* 116 Pa. St. 627; *Muller* v. *St. Louis Hospital,* 5 Mo. Ap. 397; *Taylor* v. *Wilburn,* 20 Mo. 306; *Harrell* v. *Harrell,* 1 Duvall (Ky.) 203; *Pool* v. *Pool,* 33 Ala. 145; *Marsh* v. *Tyrrell,* 4 Eng. Ecc. Rep. 34; *Dale* v. *Dale.* 38 N. J. Eq. 274; *Gay* v. *Gillilan,* 92 Mo. 251, 264; *Lynch* v. *Clements,* 24 N. J. Eq. 431; *Greenwood* v. *Cline,* 7 Oregon, 17; *Banta* v. *Willetts,* 6 Demarest, 84; *Cuthbertson's Appeal,* 97 Pa. St. 171; *Wilson's Appeal,* 99 Pa. St. 545; *Clark* v. *Stansbury,* 49 Md. 346.

*Bernard Carter* (with whom was *D. Meredith Reese* on the brief), for the appellees.

The Court below instructed the jury that as no sufficient evidence was offered to show that Catherine Davis, at the time she executed her will, was not of sound and disposing mind and capable of executing a valid deed or contract, the verdict of the jury must be for the defendant, on the issue (the 4th) which raised this question.

As the law presumes every person to be of sound mind and of sufficient mental capacity to make a valid will until the contrary appears, the plaintiffs, before they had the right to have the question of the sufficiency of the mental capacity of Catherine Davis to make the will in question, at the time she made it, submitted to the jury, were bound to offer evidence legally sufficient to overcome this presumption of the law; and to do this, they were bound to offer evidence,

which, assuming it to be true, and adding thereto the inferences which may be fairly and legitimately drawn therefrom, is sufficient to warrant the jury, in the exercise of a *reasonable intelligence,* to find that the testatrix was not of a sound and disposing mind, and capable of executing a valid deed or contract. 37 Md. 581, *Tyson* v. *Tyson.*

And, unless the Court can see that there is such evidence in the cause as will fairly support the verdict, it becomes the imperative duty of the Court to instruct the jury to find a verdict for the defendant; for the true principle is that if the Court is satisfied that conceding all the inferences which the jury could *justifiably* draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the Court should say so. *State, use of Steever* v. *Union R. R.,* 70 Md. 76, 77; *State, use of Hamelin* v. *Malster and Reany,* 57 Md. page 309; 31 Md. 149, 150, *Clark* v. *Dederick.*

At the trial below the plaintiff, in order to show that Mrs. Davis was not of sound and disposing mind, and capable of making a valid deed or contract, relied: 1st. Upon the provisions of the will itself, claiming that they were unjust. 2d. Upon the testimony of the witnesses who were examined, especially the testimony of Dr. Pritchard, one of the plaintiffs. The use which may be made of the provisions of a will, in connection with the question of the mental capacity, is explained in the case of *Davis* v. *Calvert,* 5 Gill & J., 188, 189.

An examination of all the circumstances, so far as revealed by the testimony offered on the part of the plaintiff, will show that there is nothing in the character of the will from which any inference of mental incapacity on the part of the testatrix can be predicated. How stands the case on the question of the supposed injustice of the will? Thus, Thomas Davis has two sets of children, one (the caveatees) by Catherine Davis—Catherine Davis has two sets of children, one by Thomas Davis. Thomas Davis and Catherine Davis by their joint labors and savings, accumulate property, starting on the foundation of his property, a large

part, at least, of which stands in his name. He dies first, and by his will, gives none of his property to their joint children, and but a small part to his children who were not her children ; and after his death, besides what he gives her of the property which had stood in his name in his lifetime, gives her some $12,000 to $15,000 of life insurance ; then she by her will gives to their joint children about $10,000 out of a personal property of about $17,000 and some real estate, small house property at Canton, whose value is not given. Can such a will afford any part of the foundation for a rational inference that the testatrix was wanting in mental capacity ? We respectfully submit, that this question can only be answered in the *negative.*

*As to testamentary capacity.* The testimony shows very clearly that Catherine Davis was a woman of untiring energy and industry, never satisfied unless she was actively employed; she had unusual business capacity and a *strong will*; her business qualities, independently of any tribute to them by the witnesses in the case, being shown by her successful and profitable management of the stores she kept, as well before as after her marriage to Mr. Davis.

In view of all that took place, in connection with the preparations for making her will and the execution of it; the exercise of mental faculties shown in the selection of the property she wished to pass by the will, and what she did not wish to pass by the will; the selection and appropriation to each one of her children of the several lots she wished to give to each child, and the description of the location of each of said pieces of property; the determination to read the will herself; the selection by her of the witnesses to the will; the precaution she took the day she executed the will that no one should see her executing it; the request she made that no mention should be made of the making by her of her will, and the reason she gave for the request, namely, that if it was known there might be some trouble, and she did not wish any trouble while she lived; it is respectfully submitted that in a very marked and de-

cided manner, there is demonstrated, not only the posses-
sion by her of the fullest intelligence and mental vigor, but
that she fully realized, understood and weighed the nature
of the act she was performing and its consequences ; and
the time which elapsed between the giving of the instruc-
tions and the execution of the will, shows that nothing in
connection with the matter was done in a hurry, but with
full consideration and deliberation.    In view then of these
facts, and of the testimony offered by the plaintiffs of the
strength of will, business qualities and mental vigor of Mrs.
Davis, as shown in all her previous life, we respectfully sub-
mit that very strong and clear testimony must be produced,
before any tribunal, in the exercise of a reasonable intelli-
gence, could find that, at the time the will was made, she
had not mental capacity to enter into a valid deed or con-
tract.

The testimony will show that *at least*, up to two weeks
before her death, on February 9. 1892, (during these two
weeks she was in bed, and her condition then is not shown),
and, therefore, for a period of nearly eighteen months after
the date of her will, she continued not only to act and talk,
but to comprehend what was said to her, and was still going
about the city, as had been her custom, and that, too, in
company with or visiting one or more of those of her chil-
dren, who are now endeavoring to set aside her will.    *But
also*, that during all this time while she was thus talking and
acting and going about, there is not a single instance, testi-
fied to, in which Mrs. Davis ever did or said a thing that
indicated any want of mental capacity.    There is no evi-
dence that, during her whole life, she ever did or said a
thing that even might be called eccentric.    They say she
was sometimes forgetful, but there is not a single instance
of a lapse of memory testified to, to which the most intelli-
gent and well-balanced people might not be subject.

We come now to consider the testimony of Dr. Pritchard,
one of the caveators, the son-in-law of Mrs. Davis, and
from time to time her physician.    Before examining his tes-

timony, we submit to the Court the following legal proposi-
tions: 1. That though a physician, who was sufficiently
well acquainted with a testator to form an intelligent opin-
ion of her mental capacity, may be asked to give that opin-
ion in evidence, and may testify that, in his opinion, the
mental capacity did not exist, and he need not be asked to
state the facts and circumstances on which his opinion is
founded; and if he is not asked to give the reasons on which
his opinion is founded, the party offering his naked opinion
would have a right to have that opinion to go to the jury;
yet, if he is asked to give the *reasons* on which his opinion
is based, and does give them, and the reasons he gives are
such that men of ordinary knowledge can weigh, and are,
in the judgment of the Court, such that no rational infer-
ence can be deduced therefrom that the testator was want-
ing in the requisite mental capacity, his opinion does not
afford evidence legally sufficient to show such want of ca-
pacity.   2. Independently of any decision of a Court on
this subject, the proposition is so in accordance with cor-
rect principles that it must be accepted.   For it cannot
be that a testator or any other person shall be adju-
dicated as of unsound mind, merely because some physi-
cian says that, in his opinion, he was of unsound mind,
when the only reasons he has for such an opinion are such
that when stated as the foundation for his opinion, right
reason at once rejects them as furnishing any foundation for
the opinion thus expressed.   When a physician expresses
an opinion that a testator had not sufficient mental capacity
to make a valid deed or contract (and this is the test in
Maryland), and says his opinion is founded on certain facts
and reasons, which men of ordinary information and intelli-
gence can weigh, then whether the conclusion he has
reached is a rational conclusion, is as much open to enquiry
by the Court in determining whether there is any evidence
legally sufficient to show such want of mental capacity, as
if these reasons were given by a layman; for, if this were
not so, and his opinion must be submitted to the jury, no

matter whether supported by his reasons or not, then no matter how foolish and absurd his reasons, the opinion must be submitted to the jury ; and if this were the law the Court would have no right to grant a new trial if the jury found in accordance with the opinion, because if the opinion of the physician must go to them, just because it is the opinion of a physician, and whether supported by any good reason or not, the jury must take the opinion and be guided by it, no matter how foolish they find the reasons.

And to this effect are the authorities. 1 *Wharton on Evi.*, sec. 451 ; *Waters* v. *Waters*, 35 Md. 541 ; *Brooke* v. *Townsend*, 7 Gill, 29 ; *Staeckhouse* v. *Martin*, 15 N. J. Eq. 208.

Now, so far from any act or word of Mrs. Davis testified to by Dr. Pritchard evidencing a want of mental capacity, all that is shown to have been said or done by her was most sensible ; nor is there anything shown in his testimony which affords a basis on which any one in the exercise of reasonable intelligence can conclude that her mental poise was in any way shaken.

Let the Court search the testimony of Dr. Pritchard from end to end, and it will be found, that he gives no other reasons for the opinion he interestedly and flippantly expresses, that Mrs. Davis had not, after she heard of the caveat, sufficient mental capacity to make a will, or any valid deed or contract, other than that she was sickly, had gastritis, became excited, worried and distressed over the possible consequences of the caveat, and forgot some altercations with members of the family, which he said she had mentioned to him. And it is to be remembered, as heretofore shown, that the doctor expressly states that he founds the opinion he gives only on the reasons he gives. Now we have shown that, so far as the sickness and gastritis is concerned, he admits that these had not affected her mind, and we have shown how absurd is the idea that a few acts of forgetfulness are any evidence of want of mental capacity, and we have shown how, notwithstanding her excitement,

worry and distress, which was largely mingled with *indignation*, she steadily kept on her way, with the aid of counsel, employed by her, till she had fought the battle to a finish, and defeated the suit which had caused her the worry ; and during all the time the suit lasted, did no foolish act, and uttered no words other than those marked by excellent sense, though many witnesses have testified to all she did and said during this period of time ; and continued to attend to her business till a few weeks before her death.

BOYD, J., delivered the opinion of the Court.

Upon a caveat to a will of Catherine Davis issues were framed by the Orphans' Court of Baltimore City and sent to the Superior Court for trial.   They presented the following questions:

1. As to the formal execution of the will.

2. As to her knowledge of its contents.

3. Whether it was procured by undue influence exercised and practised upon her.

4. Whether it was executed by her when she was of sound and disposing mind and capable of executing a valid deed or contract.

Four daughters of Catherine Davis by her former marriage, and the husbands of those who were married, were made the plaintiffs, and her children by her second marriage, together with the husband of a married daughter, were made defendants.   At the trial the defendants produced the will and examined the two subscribing witnesses for the purpose of proving the execution of it.   The plaintiffs then called a number of witnesses to show undue influence and want of testamentary capacity on the part of Mrs. Davis. At the conclusion of the plaintiff's case, the defendants offered three prayers, which were granted by the Court, instructing the jury to find for the defendants on all four issues.   From those rulings this appeal was taken.

The first prayer referred to the first and second issues, and as there can be no doubt about the correctness of the

rulings of the Court below in reference to them, excepting so far as the second issue may be affected by the questions raised by the third and fourth, we will proceed at once to the consideration of the other two prayers. By the third the jury was instructed that no sufficient evidence had been offered to show that the will was procured by undue influence, and therefore their verdict must be for the defendants on the third issue; and the fourth instructed them that no sufficient evidence had been offered to show that Catherine Davis was not of sound and disposing mind, capable of executing a valid deed and contract at the time she executed the will, and therefore their verdict must be for the defendants on the fourth issue.

We will first consider the fourth prayer, as that involves the foundation of all valid wills—testamentary capacity.

The burden was on the caveators to overcome the presumption of law that Mrs. Davis was of sufficient mental capacity to make a will. They having undertaken this, it is incumbent on us to examine the record to see whether the evidence offered by them was legally sufficient to fairly support a verdict if the jury found for them. As has often been said by this Court, if the facts proved are such that a rational mind might in reason and fairness from them draw the conclusion sought, it is the duty of the Court to submit the case to the jury. In the case of *Hiss* v. *Weik*, 78 Md. 439, the question was stated thus: " Was the evidence offered by the caveator, assuming it all to be true, as must be done when weighing its legal sufficiency upon a prayer of this character, so utterly inconclusive or devoid of probative force as not to enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the proposition sought to be maintained by it?" Cases often arise in which plaintiffs have so signally failed to sufficiently prove some material fact upon which their right to recover depends, that there can be no doubt about the duty of the Court to determine the question without leaving it to the jury, as the Court is the exclusive judge of the legal

sufficiency of the evidence. But the difficulty sometimes is, particularly in cases of this character, to distinguish between the weight of evidence and its legal sufficiency. The trial Judge may differ from the jury as to the former, and may think they should have found differently, or, if sitting as a juror, or in some case where he is authorized to determine the facts, he may reach a different conclusion from what a jury might have done. In this case, the plaintiffs may not have offered such evidence as would convince the learned Judge below that Mrs. Davis was not capable of making the will in controversy, but the question is whether there was not sufficient evidence to require him to submit it to the jury, under the principle of law governing such cases established by this Court.

The evidence shows that Mrs. Davis was married twice, the first time to a Mr. Jenkins. The female plaintiffs are the surviving children of that marriage. Mr. Jenkins died in 1861, and his widow married Thomas D. Davis in 1862. Shortly before the death of Mr. Jenkins, the property accumulated by his wife was lost through some of his financial troubles. She was an industrious, hard-working woman, and it was not long before she commenced to recover from from her losses and to acquire more property. Mr. Davis was, at the time of their marriage, receiving a salary of $150 per month, and continued to do so for about eighteen months, when he lost his place by reason of the establishment, with which he was connected, suspending work. He was out of his regular employment for about eight years, during which time his wife worked hard to suppport the family. She was assisted by those of her children of her first marriage, who were still at home, and there is testimony tending to show that Mr. Davis did very little towards supporting the family or accumulating any property during that time. He died on April 25th, 1890; and at the time of his death there was considerable property in his name, a part of which he left to his children by his former marriage, and the rest to his wife. She also received some twelve or fifteen thousand

dollars from insurance on his life.   She died on February 9th, 1892, leaving about seventeen thousand dollars of personal (including leasehold) property and six houses and lots in fee, situated in Canton, worth, probably, eight or ten thousand dollars, as stated by the Judge below.  How much of this property she received from her husband is not shown, but it is evident that a considerable part of it came through his will and insurance on his life.   The record does not show what amount of property she had on August the 13th, 1890, the date of the execution of her will.   She left to her three children (Davis children) all of the above mentioned property, excepting four pieces of leasehold property valued at $3,200.00, personal chattels valued at $908.00, and cash on hand amounting to $2,653.44.   Her children by Mr. Jenkins are not mentioned in the will, but as there was no residuary clause in it or other disposition made, excepting as to those properties specifically devised to the three Davis children, the Jenkins children would be entitled to their shares in the residuum.  The evidence shows conclusively that her relations with the Jenkins children were of the most pleasant character, and no good reason has been assigned why they were not mentioned in the will, excepting the contention by the appellees that it was because most of the property came from Mr. Davis, and hence she may have felt under obligations to leave it to his children.   But the evidence does certainly tend to show that whatever may have been the facts as to how the property was *held* when Mr. Davis died, his wife was entitled to the credit of being largely instrumental in acquiring it and that she paid at least some of the life insurance premiums.   If it be conceded then that most of the property stood in his name when he died, that fact of itself could not wholly account for the omission of the Jenkins children from their mother's will.   Of course it is not sufficient to avoid a will to show that a testator has left his estate to some children to the exclusion of others without any apparently valid reasons for it, as the testator may have had what to him at least seemed to be sufficient reasons,

but which are not disclosed by the testimony.    But in passing upon questions of this kind it is proper to consider all the circumstances and surroundings of the parties that could throw any light upon the subject.    In this case we cannot say there is *no evidence* of an unreasonable inequality in the disposition of the estate of Mrs. Davis, because if it be true that the property she was possessed of at the time of her death was acquired by her labor and skill, and particularly if the caveators, or some of them, materially helped her to do so, it would seem unreasonable, without some explanation, for her to make such a bountiful provision for three of her children and not even name the other four in her will.    But we must pass on to the main questions in the case.

The caveators produced as a witness, in addition to the daughters and some intimate friends of the testatrix, a practising physician who was her son-in-law, and knew her socially and professionally for a number of years.    He testified that during a period of time mentioned by him, which included the date of the will, Mrs. Davis was not of sound and disposing mind, capable of executing a valid deed or contract. It is well-settled in this State, that a physician can testify as to the mental capacity of the testator, without first stating the facts and circumstances on which his opinion was formed.    That is because he is presumed to have become, from special study and experience, familiar with the symptoms of mental diseases, and therefore qualified to assist the Court and jury in reaching a correct conclusion.    It is clear that the opinion of a medical expert on that subject is ordinarily not only some evidence, but generally very important evidence to go to the jury, particularly if he was well acquainted with the testator and attended him professionally.    But it is contended by the learned counsel for the appellees, that admitting this to be true, yet if the medical expert gives the reasons upon which his opinion is founded, and they are such as men of ordinary knowledge can weigh, and are, in the judgment of the Court, such as

no rational inference can be deduced therefrom that the testator was wanting in the required mental capacity, his opinion does not afford evidence legally sufficient to show such want of capacity.   As we understand this proposition of law we are not prepared to dispute it.   Merely because a witness is an expert does not require the Court to be bound by his opinion, if it is founded on such reasons as are clear absurdities.   If, for example, a physician were to testify that in his opinion a testator was not of sound and disposing mind, capable of executing a valid deed or contract, and would in his further examination say, that the *only* reason he had for such opinion was that the testator used patent medicines, or was a member of some religious or political faith other than his own, such opinion would be based on a foundation so clearly repugnant to right reason that a Court would not hesitate to instruct the jury it was not sufficient to support a verdict.   But we do not think the testimony of Dr. Pritchard comes within the rule sought to be established by the appellees.   His evidence was in some respects contradictory, but that was clearly for the jury and not for the Court to pass upon.   He testified in substance, that after the death of Mr. Davis a caveat to his will was filed by his children by a former marriage, and that this affected Mrs. Davis' mind.   The caveat was filed in the latter part of the May, 1890, the will executed August 13th, 1890, and she went to Saratoga for her health on August 14th, 1890.   He swore that in his opinion she was not of sound and disposing mind, capable of executing a valid deed or contract between the filing of the caveat and her going to Saratoga.   He said she came to see him every few days, consulted him about what she was to do and he found her very much excited.   He also said, "She was nothing as she had formerly been, she could be very easily persuaded; now that is my opinion, that she could be very easily persuaded to do probably absurd things, if any one would try to do so. She was forgetful at times; not every day.   Some days she would say things and the next time you would see her she

would contradict it entirely." Again he said, "On days she would have a few lucid moments; you can see that in a lunatic asylum." He further said, "Well, she was complaining of her head and headache, and then she would be saying so many funny things and contradicting them at other times again, and saying that she never had mentioned them." His evidence also showed that Mrs. Davis had been in bad health for some time ; that she had chronic gastritis, and that "this disease itself does weaken the mind, and it does not require so much excitement then to upset it." He testified to a number of other things, that, in his opinion, affected the condition of her mind, and when asked on cross-examination, "was there any thing else that she said?" he replied, "Well, I can't remember just now all that she did say." Without going into further particulars about his testimony, it is sufficient to say that it showed that he knew the testatrix well, had frequent conversations with her and opportunities to observe her mental condition, and he expressed the opinion above stated. We do not think that the reasons given by him, especially as he says that he cannot recall all that she said, are "so utterly inconclusive or devoid of probative force," as to justify the Court in withholding his testimony from the jury. It may be true that the Judge would have been fully justified in finding for the appellees on this testimony, if the case had been tried before him, but that is not the test. It is almost impossible for a witness to recall upon the witness stand every word or act of a person about whose mental condition he is testifying. It is still more difficult to convey to others all the impressions made on one's mind, when coming in ·frequent contact with a person alleged to be affected with some mental trouble. As was said in *Brooke* v. *Townshend*, 7 Gill, 28, in speaking of the admissibility of the testimony of a *non-professional* witness, "The impression made upon the mind of a witness by the conduct, manner, bearing, conversation, appearance and acts of the testator in various business transactions for a long series of years is not mere

opinion, it is knowledge." In the case of *Conn. Mut. Life Ins. Co.* v. *Lathrop*, 111 U. S. 612, the Court, in deciding that an opinion of a non-professional witness as to the men-tal condition of a party can be given, in connection with a statement of the facts and circumstances within his personal knowledge, said, "If he may not so testify, but must give the supposed silly and incoherent language, state the degrees and all the accompanying circumstances of highly excited emotion, and specifically set forth the freaks or acts regarded as irrational, and thus, without the least intimation of any opinion he has formed of their character, where are such witnesses to be found? Can it be supposed that those not having a special interest in the subject, shall have so charged their memories with these matters, as distinct, in-dependent facts, as to be able to present them in their entirety and simplicity to the jury? Or if such a witness be found, can he conceal from the jury the impression which has been made upon his mind; and when this is col-lected, can it be doubted but that his judgment has been influenced by many, very many, circumstances which he has not communicated, which he cannot communicate, and of which he himself is not aware?"

Is not this equally true as to the evidence of professional men? Their naked opinions, without giving the facts and circumstances upon which they are founded, are admissible, as we have already said, because they are supposed to have been familiar with symptoms of mental disease by study and experience. The appearance of the unfortunate one may enter largely into the reasons which lead the physician to a conclusion. A busy physician certainly ought not to be expected to recall and state all the facts and circumstances upon which his opinion is founded, even though his patient be his mother-in-law.

Mrs. Crockett said her mother was never the same after the caveat was filed; that "she was more like she was half crazy than anything else." "My mother was both broke in body and mind;" that her mother went to Saratoga "for her

health and her mind also," and used other similar expres-
sions.    Mrs. White, an intimate friend, who went with Mrs.
Davis to Saratoga, said:    "She was changed; she was
melancholy, and she was very weak and nervous."    Miss
Dinsmore said that she "considered that both mentally and
physically she was a wreck"—although she afterwards qual-
ified it somewhat.    A number of other similar expressions
were used by the witnesses which are unnecessary to quote.
We are satisfied from an examination of the whole record
that there was sufficient evidence on the question of mental
capacity to entitle the caveators to have the jury pass upon
it ; and, therefore, there was error in granting the fourth
prayer.

We do not deem it necessarry to go into any extended
discussion of the third prayer.    It is sufficient to say that
in many respects there is a marked difference between this
case and that of *Hiss* v. *Weik*, 78 Md. 439, relied on by the
appellant.    The testimony in that case shows that Bishop
Ames' will was made on the 7th of April, 1879, and that
he died on the 25th of the same month.    Mrs. Hiss received
a large portion of his estate to the exclusion of an insane
son, and that son's dependent daughter, and very little was
left to an invalid daughter.    Three days before the will was
made the testator conveyed to Mrs. Hiss for the nominal
consideration of five dollars and natural love and affection,
real estate in Baltimore City valued at forty thousand dol-
lars.    The evidence shows that she had said that she had
great influence over her father, that he would do anything
that she would ask him to do.    There were many things
in that case, which, taken together, gave some evidence of
undue influence, and therefore this Court thought the Court
below was right in submitting the case to the jury.

In this case Mrs. Davis lived nearly eighteen months
after she made the will.    Although she was constantly with
the caveators, she never told them she had any desire to
change her will, or even that she had made one.    There is
no evidence that any of the caveatees knew she had.    Much

of the evidence of the plaintiffs is to the effect that the caveatees did not treat Mrs. Davis very kindly ; if that be true, it was certainly not the kind of treatment that would likely exert an undue influence over her for their own benefit.    If the jury believed that the property in controversy had belonged to Mr. Davis, then that would be some explanation of Mrs. Davis leaving it to his and her children to the exclusion of the others.    There is no evidence in this record to show that in point of fact there was any influence exerted or attempted over the testatrix by the caveatees, or any of them, prior to or at the time of the execution of her will ; and we do not think that the facts of this case are parallel with those in *Hiss* v. *Weik*, or that the decision in that case necessarily controls this.    Without deeming it necessary to prolong this opinion further, it sufficeth to say that we do not feel justified in reversing the rulings of the Court below on the question of undue influence, but without meaning to intimate that the evidence does establish the fact that Mrs. Davis was not mentally capable of making a will on August 13th, 1890, we are of the opinion that the evidence of Dr. Pritchard, especially when taken in connection with the other testimony, was of such character as to entitle the appellants to have it submitted to the consideration of the jury.    We think, therefore, there was error in the refusal of the Court below to do so.

*Rulings reversed and new trial*
*awarded.*

(Decided March 27th, 1895.)