EMANUEL M. DAVIDOVE, EXECUTOR, *v.* ALBERT DUVALL, ADMINISTRATOR, ET AL.

[No. 90, October Term, 1930.]

346

*Decided January 16th, 1931.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Joseph Loeffler,* with whom were *Albert H. Frankel* and *Saul L. Joseph* on the brief, for the appellant.

*James W. Chapman, Jr.,* for the appellees.

DIGGES, J., delivered the opinion of the Court.

The questions which we are asked to determine on this appeal are the usual ones presented in will contests, except that here the issue submitted to the jury was that of mental capacity, a finding for the caveatee having been directed on the other issues at the close of the evidence offered on behalf of the caveators. The finding on the third issue, that of mental capacity, was in favor of the caveators, which resulted in the breaking of the will; and the caveatee appealed. There are two exceptions contained in the record, one to a ruling on evidence, the other to the ruling on the prayers. The pertinent testimony, disclosing the circumstances and conditions surrounding the testatrix in the making of the will, we will briefly state.

Mary I. Duvall, a maiden lady, was about eighty-five years of age at the time of the execution of her will. For thirty years or more she had lived in her three-story home on S. Carey Street, Baltimore, Md. She was a woman of great independence, had made her livelihood for many years, and was industrious and thrifty. She was small in stature, and not robust physically. Her nearest relatives, at the time of the making of the will, were a brother and nieces and nephews, children of a deceased brother and of two deceased sisters. Most of the nieces and nephews lived in Baltimore or vicinity, as did the brother; the record disclosing, however, that one or more of the nieces were nonresidents of Maryland. Between July 15th and July 20th, 1926, her neighbors, not having seen her about the house, made an investigation of the home, and found Miss Duvall lying on the floor in a helpless, semiconscious condition. She was unable to walk, or support herself; and was put in an automobile and taken to the home of Mrs. Evelyn B. Yeager, on Carrollton Avenue, where she remained until the middle of October, 1926. Mrs. Yeager's brother was the husband of one

of Miss Duvall's nieces, which niece lived in Washington State. On October 17th, 1926, Miss Duvall was moved to the home of a niece who lived on the Annapolis Boulevard, where she remained until her death of pneumonia on February 17th, 1927. Mrs. Yaeger had, prior to 1926, on frequent occasions attended Miss Duvall in sickness, and was a friend of long standing.

At the time she was brought to Mrs. Yeager's house in July, 1926, Miss Duvall was much debilitated physically, and in a semi-conscious condition, which apparently resulted from a combination of undernourishment and the fall which she sustained in her home. Mrs. Yeager did not send for a physician, but apparently notified Louis Duvall, a nephew of the testatrix, who came to see her on the 20th of July, and on that day called in Dr. Thomas M. Lumpkin for treatment. The doctor examined Miss Duvall, first administered a sedative, and then prescribed a tonic and treatment. He paid altogether ten visits, beginning July 20th and ending August 14th. He had never attended or known Miss Duvall prior to July 20th. One of his visits was on August 6th, after which he did not see her until August 11th. It was on August 9th that the will in question was executed. We will hereafter refer more particularly to the doctor's testimony, as it is upon his testimony the case must, if at all, be submitted to the jury. The doctor said several times during the course of his testimony that there was a steady improvement in the physical and mental condition of the testatrix, from the time of his first visit until he discontinued his calls on August 14th. He, however, gave it as his opinion that at no time between July 20th and August 14th was she capable of executing a valid deed or contract. The scrivener and executor of the will was an attorney whom the testatrix had never known prior to the time she was taken to the house of Mrs. Yeager, but was the attorney of the latter. The will was witnessed by Mrs. Yeager and a boarder in the house, Tensley A. Ragan.

The provisions of the will are simple and easily understood. It provided for the payment of the testatrix' debts

and funeral expenses, bequeathed the sum of $50 to her brother, William Wallace Duvall, and the rest and residue to be divided equally among certain named nephews and nieces, who were all of the nephews and nieces of the testatrix, other than the children of the brother, William Wallace Duvall. It further empowered and directed the executor named, Emanuel M. Davidove, who was the scrivener of the will, to convert, by public or private sale, all of the property into cash. At the time of making the will, the brother, William Wallace Duvall, was in poor health, and died some time in 1927, subsequent to the death of the testatrix. The caveators are all of his children, in their individual capacity, and Albert Duvall, as administrator of his father's estate. The record discloses that the attorney who drew the will was brought in contact with the testatrix by Mrs. Yeager, and that he was requested by the testatrix to draw the will, she at the same time giving him the names of those whom she wished to have her property and in what proportions. She also advised with him about the collection of certain ground rents.

There were two wills drawn, they being identical, with the exception that the first did not include as a beneficiary the niece who lived in Washington State. The first will was taken to Mrs. Yeager's home and read to the testatrix, in the presence of the persons who witnessed the final will, at which time it was suggested, apparently by Mrs. Yeager, possibly by the testatrix, that the name of the niece in Washington State had been omitted. The testatrix suggested that the name be inserted in the will then before them. This was not done, but a new will was drawn, in which the omission was supplied, and taken to the testatrix for execution. This was about two days after the contents of the first will were read or made known to the testatrix. The second will, according to the testimony, was read by the testatrix, read by Mrs. Yeager, and by the attorney in the presence of the testatrix and the witnesses thereto. The testatrix expressed her satisfaction with its provisions, and thereupon signed the will in the presence of the witnesses, who, in her presence and the presence of each other, signed as witnesses. The will

was then given to the executor named therein, who retained it until presented to the orphans' court for probate. After the execution of the will, the testatrix continued to advise with the attorney in respect to the collection of ground rents and the investment of funds which she had in a savings bank. Most of these investments were made in second mortgages, which paid six per cent. interest, and, in addition, a five per cent. bonus. This bonus, together with any interest or ground rents collected by the attorney prior to the death of the testatrix, was turned over to her in cash. It is uncontradicted that, after she went to live with the niece on Annapolis Boulevard, the testatrix transacted business with the attorney, and through him with other parties, including the niece with whom she was living, to whom there was a loan of $350 made and a note therefor taken; also that, in December, 1926, the testatrix went shopping with her niece on several occasions, purchasing various articles, such as clothing, hat, stockings, and a new pocketbook; that she did small things that would be expected of a woman of her age, such as sewing and knitting, and on two occasions went in an automobile to visit another niece, Mrs. Burkman, once in October, and the second time on New Year's Day, 1927, at which time she took dinner with Mrs. Burkman.

It is further uncontradicted that the testatrix died of pneumonia. It seems certain that, although the testatrix was in very bad condition, physically and mentally, when carried from her own home, where she was found, to the home of Mrs. Yeager, this condition, both physical and mental, steadily improved from that time. This is shown by the testimony of all of the witnesses, including the doctor, who says there was a steady improvement from the time he first saw her until August 14th, when he discontinued visiting her. All of the witnesses also establish the fact that she was out of bed and sitting in a morris chair between July 20th and August 14th, and that she was up and sitting in the chair at the time the will was executed. This improvement in her condition continued during the whole time covered by the testimony, extending up to January, 1927. There is

no reasonable doubt that she knew she had made a will, because she continued to transact business through an attorney whom she had consulted for the first time in regard to the making of the will, and whom she had never known before that time. It is also indisputable that the will was not executed during the illness which caused her death, as is frequently shown in contests of this character. We have, then, the picture of an aged woman, living alone, caring for herself, undernourished, and receiving a fall, causing a weak and debilitated condition of body and mind; after which, upon her removal to the house of a friend, she improves steadily and progressively to a point where she is able to attend to matters of business and do the things which those of her advanced age are ordinarily expected to engage in.

The law requires that one making a will be competent at the time the will is executed; and the question, therefore, is: Does the record before us disclose incompetency on August 9th, 1926, rendering Miss Duvall's will invalid by reason of her mental incapacity on that date? If we eliminate the opinion of Dr. Lumpkin that she was incompetent during the whole period of his attendance upon her, namely, from July 20th to August 14th, we have absolutely no testimony of incompetency to warrant a submission of that issue to the jury. Therefore, the narrow question is presented whether or not the competency of a testator must always be left to the jury, when an attending physician expresses the opinion that at the time of making the will he was not competent.

The law is settled that an attending physician is permitted to express an opinion as to competency without giving the reasons upon which such an opinion is based. *Crockett v. Davis,* 81 Md. 134, 31 A. 710, 712; *Frush v. Green,* 86 Md. 516, 39 A. 863; *Jones v. Collins,* 94 Md. 413, 51 A. 398; *Grill v. O'Dell,* 113 Md. 636, 77 A. 984; *Lyon v. Townsend,* 124 Md. 163, 91 A. 704; *Smith v. Shuppner,* 125 Md. 417, 93 A. 514; *Donnelly v. Donnelly,* 156 Md. 81, 143 A. 648, 649; *Livingston v. Safe Dep. & Tr. Co.,* 157 Md. 492, 146 A. 432, 435; *Love v. Love,* 158 Md. 481, 148 A. 814; *Johnston v. Schmidt,* 158 Md. 555, 149 A. 283. This rule applies

with greater force when the physician is the family physician, that is to say, a physician who has known and attended the testator over a period of years, thereby having become intimately acquainted with the testator's physical and mental constitution and peculiarities. His testimony, under such conditions, is more than mere opinion, and is equivalent to knowledge. The question here is not as to the admissibility of Dr. Lumpkin's testimony, but whether or not, when admitted, standing alone, it is sufficient for a jury's finding of incompetency.

In *Donnelly v. Donnelly, supra,* it was said by the court, speaking through Judge Parke: "It is not disputed that, at the time of the execution of the will in question, its maker was in bad health. The testimony on the part of the caveators tends to show that both before and after the making of the will the decedent was under the care of a physician, whose professional duty caused him to observe the physical and mental condition of his patient. The opinion of such a witness upon the testamentary capacity of the person undergoing treatment at his hands is legally competent proof. * * * The attending doctor's opinion was that the patient was not mentally competent to make a will at the date of its execution. It is urged that this testimony should be ignored, because his own and the other testimony on the part of the caveators showed his opinion to have been without foundation. This court will not permit the opinion of an expert to carry the issue of testamentary capacity to the jury, when the facts within his knowledge are not obscure and need no interpretation or explanation from a medical expert, or when such facts are not sufficient in the judgment of the court to warrant the jury in finding from them that the testator was incompetent."

In *Livingston v. Safe Dep. & Tr. Co., supra,* Judge Offutt said, after reciting the testimony of the doctor in that case: "Dr. Iglehart did not testify as an expert, expressing an opinion upon hypothetical facts, but as a fact witness, to conditions which he had actually observed. He did, it is true,

express what in a sense was an opinion, but it was an opinion based upon deductions from symptoms and conditions which he had actually observed, but which were difficult to so describe as to produce a full and accurate picture of what he saw. Such a conclusion, while called an opinion, has been described as 'knowledge at shorthand,' and has more of the elements of direct than of opinion evidence. * * * And, while such a conclusion will not be received, unless accompanied by facts indicating a rational basis for it, when so supported it is regarded as a fact, rather than an opinion. * * * The testimony of the attending physicians as to the mental condition of a patient with whom they have been closely connected for a substantial period of time, and based upon actual observation of the patient's habits, conduct, symptoms, and physical condition, falls within that classification. * * * And the conclusion of such a witness as to the mental condition of the testator, when shown to have a rational basis, is always competent, and often convincing proof of that fact."

In *Crockett v. Davis, supra,* Chief Judge Boyd said, speaking of a physician's testimony: "He testified that during a period of time mentioned by him, which included the date of the will, Mrs. Davis was not of sound and disposing mind, capable of executing a valid deed of contract. It is well settled in this state that a physician can testify, as to the mental capacity of the testator without first stating the facts and circumstances on which his opinion was formed. That is because he is presumed to have become, from special study and experience, familiar with the symptoms of mental diseases, and therefore qualified to assist the court and jury in reaching a correct conclusion. It is clear that the opinion of a medical expert on that subject is ordinarily not only some evidence, but generally very important evidence to go to the jury, particularly if he was well acquainted with the testator and attended him professionally. But it is contended by the learned counsel for the appellees that, admitting this to be true, yet if the medical expert gives the reasons upon which his opinion is founded, and they are such as men of ordinary knowledge can weigh, and are in the judg-

ment of the court such as no rational inference can be deduced therefrom that the testator was wanting in the required mental capacity, his opinion does not afford evidence legally sufficient to show such want of capacity. As we understand this proposition of law, we are not prepared to dispute it. Merely because a witness is an expert does not require the court to be bound by his opinion if it is founded on such reasons as are clear absurdities. If, for example, a physician were to testify that, in his opinion, a testator was not of sound and disposing mind, capable of executing a valid deed or contract, and would in his further examination say that the only reason he had for such opinion was that the testator used patent medicines, or was a member of some religious or political faith other than his own, such opinion would be based on a foundation so clearly repugnant to right reason that a court would not hesitate to instruct the jury it was not sufficient to support a verdict."

In each of these cases, as well as others in this court which might be cited, while stating the rule, the court found that the doctor's testimony as to facts was not so inconsequential and inconclusive as to be no proper basis of an opinion which should be submitted to the jury. The witnesses in those cases had either known or attended the testator over a period of years; while here, Dr. Lumpkin's first acquaintance with the testatrix was on July 20th, when he was called to see her, about three weeks before the execution of the will. We are not prepared to hold that this distinction would render the opinion in one case admissible, and in the other not. Without setting out the testimony as to facts held sufficient, upon which witnesses in previous cases based their opinion, we cannot say that the facts testified to by Dr. Lumpkin, gained from his personal observation of the testatrix from July 20th to August 14th, and covering the period of the execution of the will, do not form the basis for a rational opinion. He testified that when called he found Miss Duvall semiconscious and physically weak and debilitated; that she had arteriosclerosis, or hardening of the arteries; that he made an examination and administered a sedative, followed by a

tonic; that she was unable to converse rationally; and that, while her condition showed a steady improvement during the period of his attendance, covering the whole of that time, she was, in his opinion, incapable of executing a valid deed or contract. We find no error in the action of the court in rejecting the caveatee's first prayer. .

The law of the case was submitted to the jury by the granting of the caveators' first prayer and the caveatee's third and seventh prayers. This resulted in the case being given to the jury without any instruction as to the burden of proof. That instruction was contained in the caveatee's fifth and eighth prayers, which were refused; and there was error in this action, for which the case must be reversed.

There was also error in rejecting the caveatee's second, fourth, and sixth prayers. These prayers contained correct legal propositions controlling will contests, and have been specifically approved in former decisions of this court. The refusal thereof was manifestly prejudicial to the appellant, because it deprived the jury of proper instructions which would 'and should have guided them in reaching a verdict upon all the evidence. *Taylor v. Cresswell,* 45 Md. 427; *Smith v. Shuppner, supra; Harris v. Hipsley,* 122 Md. 418, 89 A. 852; *Packham v. Glendmeyer,* 103 Md. 416, 63 A. 1048; *Birchett v. Smith,* 150 Md. 369, 133 A. 117; *Higgins v. Carlton,* 28 Md. 115, 92 Am. Dec. 666; *Etchison v. Etchison,* 53 Md. 348; *Dreyer v. Welch,* 136 Md. 219, 110 A. 476; *Stirling v. Stirling,* 64 Md. 138, 21 A. 273; *Wagner v. Klein,* 125 Md. 229, 93 A. 446.

The reporter is requested to set out the caveatee's second, fourth, fifth, sixth, and eighth prayers.

As the case will be remanded for new trial, we will pass upon the exception to the ruling on evidence. On cross-examination of Albert Duvall, one of the caveators, and administrator of his deceased father, William Wallace Duvall, the witness was asked "what was the amount of the estate of his deceased father, as evidenced by the inventory which he filed." This question was objected to; and the caveatee proffered to show that the testatrix knew that her brother, Wil-

liam Wallace Duvall, was possessed of a considerable estate. The objection was sustained; and we think properly so, because it was not the best evidence of the fact sought to be proved. The records of the orphans' court should have been produced to prove this fact. The competency of the fact sought to be proved was directly passed upon and approved by this court in *Scheller v. Schindel,* 153 Md. 547, 138 A. 415. Such evidence is offered for the purpose of explaining the reason for an apparent inequality in the disposition of the testator's property among his relatives. Here, if the brother was a man of considerable estate, and that fact was known to the testatrix, it is competent to go to the jury in explanation of why she left him only fifty dollars; from which small legacy, unexplained, the jury may have inferred mental incapacity.

> *Rulings reversed, and new trial awarded, with costs to the appellant.*