# EMMA STRUTH et al. vs. ADOLPH DECKER, Executor, ET AL.

*Wills—Caveat—Testamentary Capacity—Evidence—Opinions of Witnesses—Medical Experts—Undue Influence.*

When hearsay evidence has been admitted without objection, the same effect will be given to it as if it had been legally competent.

The influence which is exerted merely to induce the making of a will, while leaving the testator free from influence as to the provisions thereof, is not undue influence in the legal sense.

Upon the trial of a caveat to a will, executed the day before the death of the testator from pneumonia, the medical evidence and that of other persons was conflicting as to whether the testator was then capable of understanding the nature of his act and as to whether the will was drawn in conformity with his directions. *Held,* that the instructions given to the jury fully and fairly submitted to their finding the questions upon which the evidence was conflicting, and that, since there was no evidence that the will had been obtained by exercise of undue influence upon the testator, a prayer submitting that question to the jury was properly refused.

When the inquiry does not relate to the general capacity of the testator as evidenced by his conduct at different times and in various transactions, but only to the effect of an illness upon his mental condition at the time of making the will, one who is neither a medical expert nor a subscribing witness is not entitled to express his opinion as to whether the testator was capable of making a will at that time.

When an attending physician has testified that the testator did not possess testamentary capacity at the time the will was made the following question may properly be asked him on cross-examination: "Now, if it should turn out in the proof that every piece of property he owned was mentioned in this will, and that all his beneficiaries are mentioned and that he has charged certain ones with advancements, and that he has made certain provisions · in regard to certain stock mentioned therein, and that all this originated with him, himself, and without any knowledge on the part of counsel, do you mean to say that such a man as that was incapable of making a valid deed or contract?"

When the lawyer who drew the will in controversy had known the testator for several years, had transacted business for him and had frequently met him socially, he may be asked to state what was the mental condition of the testator on the day the will was made as compared with his condition when the witness had previously known him.

The testator executed the will in this case at noon on the day preceding his death from pneumonia. One of the attending physicians testified that the testator was semi-conscious at 10 o'clock on that day and totally delirious at 2 o'clock. *Held*, that a medical expert may be asked if persons suffering from pneumonia, and in the condition described by the attending physician, ever rally from that condition and regain consciousness and intelligence.

When a medical expert has testified that a man may have possessed testamentary capacity at the time and under the circumstances set forth in a hypothetical question, it is not proper to ask him on cross-examination if he would have made a contract involving the amount of the estate with the testator at that time.

It is not competent to call a witness in rebuttal for the purpose of explaining the answers made by him on cross-examination, but he should have been re-examined as to such matters.

Appeal from the Court of Common Pleas (STOCKBRIDGE, J.)

*Caveator's 1st Prayer.*—If the jury find from the evidence that at the time of executing the paper writing mentioned in this cause, and purporting to be his last will and testament, and dated February 25th, 1902, Charles Struth was not of sound and disposing mind and capable of making a valid deed or contract, then he was not in possession of that description of mental capacity which is required by law and their verdict should be in favor of the caveators on the second issue, and their answer thereto, no, and the jury are instructed that the meaning of the words "sound and disposing mind and capable of making a valid deed or contract," in respect to the disposition of property by last will and testament, is that the party making such will must have understood the nature of the business in which he was engaged must have had a sufficient capacity at the time of making the said will to know and recollect his property, and to make a disposition thereof with judgment and understanding with reference to the amount and situation of his property, and to recollect the relative claims of the different persons who were or should have been the objects of his bounty, and that the meaning of the words "judgment and understanding," as used in this prayer, is not that the jury should reject the will, because they may believe that it is in its provisions unjust and injudicious, yet the provisions

of the will may be considered by them in determining the capacity or incapacity of the testator. And the jury are further instructed that it is not necessary for them to find that Charles Struth was insane in the popular sense of the word before they can adjudge him incapable of making a valid deed or contract. (*Conceded and granted.*)

*Caveator's 2nd Prayer.*—If the jury should find from the evidence that at the time of the execution of the paper writing, in evidence, purporting to be the last will and testament of Charles Struth, he was not of sound and disposing mind, memory and understanding and capable of making a valid deed or contract, then their verdict must be for the caveators on the second issue and their answer thereto, no, although the jury shall further find that said mental unsoundness was brought on by bodily ill-health and disease. (*Granted.*)

*Caveators' Prayer to Third Issue.*—The caveators pray the Court to instruct the jury that if they find from the evidence in this case that at or before the time of the execution of the paper writing, offered in evidence, and purporting to be the last will and testament of Charles Struth and dated February 25th, 1902, the contents were unknown to him, then their verdict on the third issue must be for the caveators and their answer, no. (*Granted.*)

*Caveators' 3rd Prayer.*—The jury are instructed that if from the evidence in this case, they find that when Charles Struth executed the paper writing, offered in evidence, dated February 25th, 1902, and purporting to be his last will and testament, he directed by the instructions given by him for the preparation of said paper writing that by said paper writing (if the jury find such), the house on Harlem avenue and everything in it should be left to his daughter, Emma, then, as said paper writing contains *no such provision*, the verdict of the jury on the fourth issue must be for the caveators and their answer thereto, "yes." (*Granted as modified.*)

*Caveators' 4th Prayer.*—If the jury find from the evidence in this case that when he signed the paper writing in this case, dated February 25th, 1902, and purporting to be his

last will and testament, Charles Struth did not know or understand the contents of the 1st, 2nd, 3rd, 4th, 5th and 6th items thereof, or of either of said items, then their verdict must be for the caveators on the fifth issue and their answer thereto, "yes." (*Granted.*)

The cause was argued before McSHERRY, C. J., FOWLER, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Thos. Ireland Elliott* and *Charles F. Stein* (with whom was *Francis A. Buschman* on the brief), for the appellants.

*C. C. Rhodes* and *Adolph Decker* (with whom were *F. V. Rhodes* and *Patrick F. Reddington* on the brief), for the appellees.

PEARCE, J., delivered the opinion of the Court.

This is an appeal from rulings of the Court of Common Pleas of Baltimore City in the trial of a caveat to the will of Charles Struth, deceased. Six issues were sent by the Orphans' Court to be tried by a jury. The first related to the signing and attestation of the paper offered for probate; the second, to the question of testamentary capacity; the third, to knowledge of the contents of the paper; the fourth, inquired whether any part of said paper was contrary to the testator's instructions; the fifth, whether any part of said paper was misunderstood by him at the time of execution; and the sixth, whether its execution was procured by undue influence exercised over him. The jury answered "yes" to the 1st, 2nd and 3rd issues, and "no" to the 4th, 5th and 6th, the verdict being for the caveatees on all the issues.

Charles Struth died of pneumonia, aged 66, on February 26th, 1902, after a severe illness of only eight days, leaving an estate of $26,000 which he had accumulated in the wholesale and retail liquor business. His wife had been dead twenty years, leaving seven children all of whom survived him. The eldest child, Mrs. Schaeffer, sixteen years of age at her mother's death, took charge of her father's house and children until

her marriage nine years later, after which she continued to live near him, in daily communication and upon affectionate terms. To her he gave $1,200 upon her marriage, to aid her in the purchase of a home, and from time to time he put various small sums of money into a building association in the name of each of her children. After the marriage of Mrs. Schaeffer, his second daughter, Mrs. Fehrenholtz, took charge of the family until her own marriage, when the third daughter, Emma, succeeded her, and continued in charge until her father's death. The eldest son, Charles G. Struth, was intemperate in his habits, but about a year before his father's death, prevailed upon him by promises of reform, in spite of previous estrangements, to sell him his business and stock of liquors for $3,000, of which he had paid only about $1,000 at his father's death. This transaction had proved very unsatisfactory to his father, who was much disturbed at his son's failure to give proper attention to the business. The second son, Alexander, was also of intemperate habits, and had failed in a saloon business in which his father had established him, resulting in estrangement between them also. The daughters were all dutiful and affectionate to their father, as the other sons also appeared to be. The will, transcribed herein in full, is as follows:

"I, Charles Struth of Baltimore City, being of sound and disposing mind, memory and understanding do make and publish this as and for my last will and testament in manner following, that is to say:

"After the payment of my just debts and funeral expenses, the payment of which I hereby charge my hereinafter named executor to pay, I give, devise and bequeath my property in manner following.

"*First.* I give and bequeath to my son, Charles G. Struth, the property in which he now resides, being known as 133 W. Camden street, subject however, to the payment to my executor of the sum of $1,000, that is to say, that Charles G. Struth, my son, shall pay to my estate one thousand dollars and take property No. 133 W. Camden street, and if he does not desire to take such property and pay one thousand dollars, then he shall have $3,500, in cash absolutely and renounce all right to said property, and in case of such renunciation,

then the said Charles G. Struth shall have no interest in said property, but property shall be sold and divided among my other children, share and share alike.

"*Second.* I give and bequeath to my son, Alexander W. Struth, the sum of $3,000 in stock of the Equitable Building and Loan Association of Baltimore City, and in the event of the stock not being worth $3,000, then the executor of my estate shall make up the difference from the rest and residue of my estate. I intend this bequest to be all Alexander W. Struth shall have, owing to advancements made during my lifetime.

"*Third.* The life insurance policy on my life in the German Life Insurance Company of New York shall be divided equally among my six children, with the exclusion of Alexander, as I set out heretofore that I did not desire Alexander to have anything but the legacy left to him hereinbefore set out.

"*Fourth.* The house in which I now reside, No. 810 Harlem avenue, and the house on Portland and Emory streets I direct my executor to sell and divide among my six (6) children, with the exception of Alexander. I have seven (7) children, and when I say six (6) I mean the exclusion of Alexander.

"*Fifth.* All the rest and residue of my estate I direct my executor to sell and divide among my six (6) children, with the exclusion of Alexander.

"*Sixth.* I do further constitute, nominate and appoint my friend and attorney, Adolph F. Decker, to be the executor of this my last will and testament.

"As witness my hand and seal this 25th day of February, 1902.

Charles Struth, (Seal.)

Witness:

    Mrs. C. W. Ahrling,
    Emelina C. Blight."

This will is not in accord with the previously avowed intention of the testator as to his children, and especially as to his daughter, Emma. Mrs. Schaeffer testified that her father told her that he intended to give Emma more than any of the other children. Leopold Wieman, an intimate friend of thirty years standing, testified that Mr. Struth frequently talked with him about his will, the last time about ten days before his death; that he always said he had provided for Charlie, and

had given Aleck too much; Wieman also testified that he sold to Mr. Struth at a very small advance, the Harlem avenue house which he Wieman, had purchased for a young man in his office, because he learned Mr. Struth had been a competitor for it at the sale, and the latter told him he wanted it for a home for his afflicted daughter, Emma.

Mrs. Schaeffer's husband testified, that Mr. Struth told him as he had lost money by Aleck, "he would take off of him, what he lost by him," and that he would leave his daughters more than his sons, "because they stayed at home, and did his house work when the boys went out and had a good time;" and Mrs. Skatum, his sister-in-law, testified that he told her "he had to look out for Emma, and see she had a home and something to keep her after he was dead, and that the money Aleck lost for him was going to be taken out of his will."

The marked discordance between this will, and the previously avowed intention of the testator, cannot however, authorize its overthrow, if he possessed the requisite testamentary capacity *at the time of its execution*, and was *then* free from the exercise of undue influence, and it is to these inquiries that our attention must be directed in connection with the rulings of the Court below.

This will was executed about noon on Wednesday, February 25th, and he died very early in the morning of the following day, having been delirious, or unconscious, constantly, since two o'clock on Wednerday, according to the testimony of Dr. Cook, his attending physician. The only persons present during the instructions for, and preparation of, the will, which were given and made in the sick chamber, were the attorney, Mr. Decker, who drew the will; the testator's son, Charles G. Struth, since deceased, who procured the attorney; and the trained nurse, Miss Blight, who had left the State before the trial below, and whose testimony was not secured. Mrs. Ahrling came in after the will had been prepared, as a witness to its execution. There was proof that Mr. Struth was a man of vigorous mind and strong purpose,

and if the will offered for probate, as drawn, conformed to the instructions given by him to the draughtsman, it affords very strong internal evidence of abundant testamentary capacity. The attorney, Mr. Decker, swears that he knew nothing of the testator's property, or of his plan of disposition of his estate, until he sat down in the sick chamber on February 25th to draw the will, and that Mr. Struth himself, slowly and painfully, but with absolute clearness and precision, dictated to him, each item of the will, of which he made a memorandum in writing, as each item was dictated, and that from the rough draft so made, he wrote the will offered for probate and read it to Mr. Struth, who said it was all right, and immediately executed it in the presence of the two witnesses whose names are appended thereto, Mrs. Ahrling and Miss Blight. Unfortunately neither Charles G. Struth nor Miss Blight, the only two persons who were present when the instructions were given, and the will was read to the testator, are available to confirm or deny the testimony of Mr. Decker, but we must remember that he is under the double obligation of an officer of the Court, as an attorney, and as a witness sworn in the case, and effect must be given to his testimony accordingly, unless it is discredited according to the rules of evidence.

Emma Struth, the testator's youngest daughter, testifies that later in the same afternoon, when it is conceded her father had become totally unconscious, the nurse said to her, "are you the youngest daughter?" to which she replied, "yes. Why do you ask?" and the nurse said, "Oh, the home and everything in it is yours," that she replied, "Why do you say that; how do you know it?" and that the nurse who had only been employed that morning said, "I heard it through your father's saying. I would not worry, because the home is yours." This testimony though hearsay was admitted without objection, and this being so, it is in the case for all purposes, and the Court must give it the same effect as if it had in fact been legally admissible. *Slingluff* v. *Builders Supply Co.*, 89 Md. 557.

Dr. Cook the attending physician, saw him at ten o'clock

on Wednesday and swears that he was then semi-conscious, and in his opinion incapable of making a valid deed or contract; that he saw him again at two o'clock and that he was then delirious and decidedly incapable of making a valid deed or contract. Dr. Street, who was called in consultation, saw him about four o'clock on the same afternoon, and says he was then quite delirious, and to a hypothetical question based upon Mr. Struth's condition at seven and ten o'clock the same morning, says that at the time the will was executed he was in his opinion incapable of making a valid deed or contract. Dr. Preston, on the other hand, being produced as an eminent authority, in reply to various hypothetical questions embodying the facts as to Mr. Struth's condition from time to time on that day, testifies that in his opinion he was capable of executing a valid deed or contract up to noon of that day. It should be noted in connection with the reference to Dr. Cook's testimony that when he called at seven o'clock that morning Mrs. Schaeffer told him one of the sons wished to bring a lawyer there to transact some business, and she asked if he would permit it, and that he consented, provided the business could be transacted in ten or fifteen minutes, without mentally taxing Mr. Struth, but that no reference was made to a will, and his attention was not drawn to that matter. But he also testified that at his ten o'clock call there was a decided change in him; that his mental condition was not nearly so good as at seven o'clock; that he was not fully conscious of his surroundings or responsibilities; and upon reading the will, the doctor testified that in his opinion, even at seven o'clock that morning, Mr. Struth could not have thought out by himself the provisions and discriminations of *that will*, and said, "in fact, *I know* Mr. Struth could not have done that at seven o'clock, and after ten o'clock it was utterly impossible."

Mrs. Ahrling, the only accessible subscribing witness to the will, unhesitatingly declares he was not capable of making a valid deed or contract when she witnessed the will, and that she did so because she "was just simply to witness his signature."

The first issue was abandoned by the caveators at the argument in this Court.

The question of testamentary capacity and of the conformity of the will as prepared and read to the testator, with the instructions said to have been given by him to Mr. Decker, and of the testator's knowledge and understanding of the provisions of the will as read to him, were all fully and fairly submitted to the jury by the caveators' 1st, 2nd, 3rd and 4th prayers which were granted and the verdict of the jury upon all these questions were against the caveators. They exhausted their remedies in this regard when their motion for a new trial was made and overruled, and we have no power to review these findings of fact by the jury.

There was a mass of testimony tending to show that but for the zeal of Mrs. Frackman, the mother-in-law of Charles G. Struth, and his subservience to her urgency, no will would have been made, but it would serve no useful purpose to detail the testimony upon this point, because the influence which is exerted merely to induce the making of a will, while leaving the testator free from influence, as to the provisions of the will, is not undue influence in the legal sense. Undue influence is defined in *Schouler on Wills* as "that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist." Section 228, 2 ed. It presupposes testamentary capacity, because where there is no capacity, there can be no will, and the question of whether or not there was undue influence in its making, would be an idle one. 27 *Amer. & Eng. Ency. of Law*, 497; *Stirling* v. *Stirling*, 64 Md. 151.

The fifth prayer of the caveator defining undue influence and asking that if the jury found this will was procured through such influence their verdict must be for the caveators, was refused upon the ground that there was no legally sufficient evidence of such influence, and following the numerous decisions of this Court upon this question, we are constrained to hold that we can discover no such evidence in this record. To hold otherwise would be to indulge in mere suspicion and

imagination.   Upon the facts of this case as disclosed by the record, the only logical ground upon which this will could be attacked, would be that of a conspiracy to make a will for a man incompetent to make one for himself, and that ground has been conclusively passed upon by the jury in the exercise of the power given to them, and withheld from the Courts, to determine all questions of fact.

Ten exceptions to the evidence remain to be considered but only the first seems to have been regarded as important by the appellant.

This exception raises the question as to when witnesses, not medical experts, or subscribing witnesses, will be allowed to express an opinion as to the capacity of an alleged testator to make a valid deed or contract.   This question was asked of Mrs. Schaeffer, the testator's eldest daughter, who was not permitted to answer it, and it was strenuously and ably argued that this refusal was error, and the argument was based upon the conceded rule that "judgment founded on actual observation of the capacity, disposition, traits and character of the person under consideration is more than mere opinion; that it approaches knowledge, and is knowledge, so far as the imperfection of human nature will permit knowledge of these things to be acquired, and that the result thus acquired should be communicated to the jury because they have not had the opportunity of personal observation, and because in no other way can they effectually have the benefit of the knowledge gained by the observation of others."   The language we have thus reproduced is from an opinion of a profound Judge, JUDGE GASTON, in *Clary* v. *Clary*, 2 Iredell, 78; but it must be taken in connection with the facts of the case in which the language was used.   This is equally true of all the cases cited by the appellant upon this exception.   Without referring specifically to the facts of these cases, it will be seen that in all of them the persons whose wills were questioned, were in good physical condition, and the question was one of *sanity or insanity*, not a question of testamentary capacity, dependent upon physical exhaustion merely, or the obscuration of the

mental faculties upon the near approach of death. That the decision in the Maryland cases cited by the appellant, such as *Stewart* v. *Spedden*, 5 Md. 436; *Weems* v. *Weems*, 19 Md. 334; *Williams* v. *Lee*, 47 Md. 32; *Kerby* v. *Kerby*, 57 Md. 345, and *Jones* v. *Collins*, 94 Md. 409, clearly make this discrimination, will appear from reference to them, and the recent *Berry Will case*, 93 Md. 579, 580, confirms this discrimination. In that case, the present Chief Justice, quoting from *Townshend* v. *Townshend*, 7 Gill, 28, refers to "the impression made upon the mind of the witness by the conduct, manner, bearing, conversation, appearance, and acts of the testator in *various business transactions for a long series of years,* as not mere opinion but knowledge;" and he there added, "hence if the basis (of knowledge) is trivial or insufficient, the witness should not be permitted to express any opinion at all." In this case the basis is insufficient, because the inquiry does not relate to the general capacity of the testator to be determined from habit, conduct or demeanor, but to his physical condition suddenly induced by illness aud dethroning his normal mental faculties. Under the circumstances of this case we think there was no error in this ruling.

Upon cross-examination, Dr. Street, after stating that he had heard the will read, was asked this question:

"Now Doctor, if it should turn out in the proof that every piece of property he owned was mentioned in this will, and that all his beneficiaries are mentioned in this will, and that he has charged certain ones with advancements, and that he has made certain provisions in regard to certain stock mentioned therein, and that all this originated with him, himself, and without any knowledge on the part of counsel, do you mean to say that such a man as that was incapable of making a valid deed or contract?" This was objected to, and the second exception was taken to its allowance. This question may not be framed with strict regard to the usual form of hypothetical questions, but it is clearly proper cross-examination, and the refusal of the question would have been hypercritical.

Of the third and fourth exceptions, it is only necessary to say that the questions refused upon re-examination related to nothing brought out in cross-examination, and therefore came too late.

The fifth exception was taken to the allowance of the following question to Mr. Decker, the attorney who drew the will : ''What was his mental condition the day you drew his will, as compared with his mind as you knew him before ?'' It is contended that this asks for *mere opinion,* from one who is neither an expert, nor a subscribing witness, and was therefore improper. But Mr. Decker had known Mr. Struth for fifteen years, had been accustomed to meet him socially at the Germania Maennerchor where he frequently played cards with him, and had transacted one piece of business for him three or four years before, and we think he had the opportunity to form a rational opinion, and that the facts deposed to by him in his testimony did furnish a rational ground for making the comparison sought in the question. *The Berry Will case*, 93 Md. 580.

There was obviously no error in the ruling on the sixth exception. Dr. Cook having testified that Mr. Struth was semi-conscious at ten o'clock, and totally unconscious at two o'clock, Dr. Preston, for the appellees, was asked if persons with pneumonia, and in the condition described, ever rally from that condition and regain consciousness and intelligence. Dr. Preston's affirmative reply conveys the expert's knowledge, and it is corroborated by common experience. The weight of this testimony in this case may have been light, but it was for the jury.

The seventh and eighth exceptions were practically the same as the second, and the rulings were correct for the same reason.

The ninth exception was taken to the refusal of the following question to Dr. Preston upon cross-examination: ''would you have made a contract with Mr. Struth at any time between ten and twelve o'clock that day, involving $26,000?'' If this question had been specifically addressed to Mr. Struth's men-

tal capacity at that time, as the test of the witness' willingness to make a contract with him, we think it might have been admissible as probing his candor and fairness; but it is obvious that Dr. Preston as a physician may have believed, upon the facts presented to him, that Mr. Struth was competent, and yet have been unwilling, both as a man and as a physician to enter into such a contract,

Dr. Street was called in rebuttal by the caveators, and after reciting to him portions of Mr. Decker's testimony as to the dictation of the will to him by Mr. Struth; and his own previous ignorance of the testator's property, and its intended disposition, he was asked "with this additional knowledge what he had to say as to Mr. Struth's capacity to make the will in question," and the tenth exception was taken to the refusal of this question.

We cannot perceive that this tended to rebut anything brought out in Mr. Decker's testimony, and if intended to reply to the hypothical question and answer to Dr. Street which was the subject of the second exception, the witness should have been re-examined upon the conclusion of the cross-examination, and not called in rebuttal.

It follows that the rulings appealed from must be affirmed.

*Rulings affirmed and cause remanded.*

(Decided January 18th, 1905.)