MARIE AGNES JOHNSTON, Executrix, *v.* ALFRED
G. SCHMIDT.

[No. 3, January Term, 1930.]

*Decided March 12th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*J. Cookman Boyd,* with whom was *Emil Budnitz* on the brief, for the appellant.

*Edward L. Ward,* with whom was *Stephen W. Leitch* on the brief, for the appellee.

DIGGES, J., delivered the opinion of the Court.

Catherine Schmidt, a widow, died on February 5th, 1924, at her residence, 714 Appleton Street, Baltimore, Maryland. At the time of her death she left surviving her three sons, namely, Edward, Walter, and Alfred; the last-named being the appellee. She also left one daughter, Marie Agnes, the appellant, who subsequently married Johnston. The

death of the deceased was occasioned by an affection or disease of the heart, which resulted in her confinement to bed for about five weeks previous to her death. She had executed two wills, the first some time about 1921, and the second on January 30th, 1924, during her last illness. Her husband predeceased her, having died in 1918. During her lifetime she was seised and possessed of a number of pieces of real estate located in Baltimore City, either fee simple or leasehold property. In 1916, prior to her husband's death, a trust was created in respect to three pieces of this property, the provisions of the deed of trust being that Catherine Schmidt should be entitled to the income arising therefrom, with power to dispose, either by sale or mortgage, of all or any part of the property included in the deed of trust, and at her death such of it as might then be undisposed of became the property of her four children, share and share alike as tenants in common. In addition to this trust property, she owned other real estate. Previous to her death the title to the Appleton Street or home property had been put in the joint names of herself and daughter as joint tenants, with the right of survivorship; and the title to certain deposits in savings banks and building association at the time of her death stood as follows: "Catherine Schmidt, trustee, in trust for herself and Marie Agnes Schmidt, joint owners, subject to the order of either, the balance at the death of either to belong to the survivor." According to the provisions of her will, dated January 30th, 1924, she bequeathed to each of her sons a legacy of $500; all the rest and residue of her property, of every kind, of which she died seised and possessed, was devised and bequeathed unto her daughter for and during the term of the daughter's natural life, with full power and authority to the daughter to sell, mortgage, lease, convey or otherwise dispose of all or any portion of said estate, and appropriate the proceeds of such disposition to her own use; and from and after the death of the daughter one-third of the residue was devised and bequeathed to each of the sons, their heirs, personal representatives and assigns. The will further

provides that if any of the sons died before the daughter, leaving a child or children, or descendants of a deceased child, then the son's share was to become the property of his descendants, *per stirpes* and not *per capita;* and if any of the sons died before the daughter, without leaving child or lineal descendant, such share of the son so dying was devised and bequeathed to his surviving brothers or brother. The daughter was appointed executrix by the will, and relieved of the necessity of giving bond, so far as the law would permit.

The previous will, *i. e.,* the one executed about three years before the death of the testatrix, was in all its essentials a duplicate of the last will, with the single exception that under the provisions of the first will the legacy bequeathed to each of the sons was $50 instead of $500 as provided in the second will. The last will also contained a clause revoking all former wills; and, at the time of the execution of the last will, the first will was destroyed, by direction of the testatrix, upon being told by the scrivener that it was then of no force and effect. The last will was probated on February 11th, 1924, and the daughter qualified as executrix and proceeded in the settlement of the estate, in accordance with the terms of the will. On June 21st, 1924, each of the brothers received from the executrix his respective legacy of $500, and executed a release therefor, reciting: "Whereas, by said will of said Catherine Schmidt, the sum of $500 was bequeathed by her to each of said grantors herein, which legacies the said Marie Agnes Schmidt has paid to said grantors, the receipt whereof is hereby acknowledged, the said Luther Edward Schmidt, Walter L. Schmidt, and Alfred G. Schmidt do hereby release, acquit, exonerate and discharge the said Marie Agnes Schmidt, her heirs, personal representatives and assigns, of and from all claim or demand for or on account of said legacies, or the payment thereof, declaring themselves fully satisfied and paid, as aforesaid." At the same time the daughter conveyed to the three sons her undivided one-fourth interest in the pieces of property covered by the deed of trust, and received a reconveyance from the sons of an estate for

her life in the whole of the property covered by the deed of trust; the intent and purpose of the exchange of these deeds being to give the daughter the same estate in the property covered by the deed of trust as she took in the properties covered by the will, with the exception that in respect to the properties in the deed of trust the daughter had no power of disposition, whereas in respect to the properties passing under the will she had the right to sell and appropriate the proceeds to her own use.

At the time of the mother's death the daughter was forty-four years old, and in September, 1926, she married. Upon rumors of her approaching or intended marriage, the brothers, or at least the appellant and Edward, apparently began to investigate the possibility of successfully caveating their mother's will, and in November, 1926, after the sister's marriage, they consulted counsel with that end in view. The advice and information obtained resulted in Alfred filing a caveat to the mother's will on the day before the three years within which he might caveat would expire. He asked in his petition that issues be sent to a court of law to determine whether or not at the time of the execution of the will his mother was of sound and disposing mind and capable of executing a valid deed or contract; and, second, whether or not the alleged will was produced by undue influence practiced upon her. The sending of these issues was opposed by the executrix on the ground that the acceptance of the legacy and the release which the caveator had signed barred him from thereafter contesting the validity of the will. This was held by the orphans' court to be a good defense, and the issues were refused. From that action the caveator appealed to this court, resulting in a decision in the case of *Schmidt v. Johnston,* 154 Md. 125 The opinion of the court in that case was written by Judge Parke, and it was held that the caveator was entitled to have the issues framed and sent to a court of law on the preliminary question as to whether or not he occupied such a position as would entitle him to caveat the will of his mother, the court saying: "The averments of

the caveat are sufficient for the caveator to have had the two questions of mental capacity and undue influence presented in the form of issues for trial by jury, provided the caveator's receipt of his legacy and his release therefor to the executrix do not prevent. It is well settled that a person cannot accept and reject the same instrument, but must abide his choice of remedies or of rights arising thereout. So, if one is paid his legacy and gives an acquittance to the executor, he ordinarily cannot assail the validity of the will under which he became entitled. But this general rule is subject to the conditions that when the party acted he must have known of the existence of the circumstances which, giving rise to inconsistent rights, made necessary a choice between them, and that he had the intention to elect, either expressly or by acts which implied choice and acquiescence. Unless, therefore, the legatee here knew, or was put on inquiry, at the time of the payment of the legacy and of the execution of the release, of the lack of testamentary capacity of his mother when she executed her will, and of the undue influence practiced upon her and constraining her will in its making, the basis of an election is gone." Citing previous decisions of this court, and other authorities, to sustain that position. The case was therefore remanded in order that Alfred might have framed, and sent to a court of law, issues to determine whether or not, at the time he received the legacy and executed the release, he knew or was put on notice or inquiry as to the facts and circumstances rendering the will invalid by reason of the incapacity of the testatrix, or by reason of undue influence practiced upon her and constraining her will therein. Subsequently, on May 4th, 1928, the Orphans' Court of Baltimore City ordered that the following issues be sent to the Superior Court of Baltimore City to be tried before a jury:

"1. Did Alfred G. Schmidt accept the sum of five hundred dollars ($500) provided as a legacy in his favor by the paper writing dated the 30th day of January, 1924, purporting to be the last will and testament of Catherine

Schmidt, deceased, and did he execute a release therefor to the executrix named in said alleged will with full knowledge of the facts and circumstances relating to the mental capacity of said Catherine Schmidt to execute a valid deed or contract?

"2.  Did Alfred G. Schmidt accept the sum of five hundred dollars ($500) provided as a legacy in his favor by the paper writing dated the 30th day of January, 1924, purporting to be the last will and testament of Catherine Schmidt, deceased, and did he execute a release therefor to the executrix named in said alleged will with full knowledge of the facts and circumstances relating to the question of undue influence that may have been exercised and practiced upon the said Catherine Schmidt in connection with the execution by her of said alleged will heretofore admitted to probate by the Orphans' Court of Baltimore City.

"3.  Did Alfred G. Schmidt accept the sum of five hundred dollars ($500) provided as a legacy in his favor by the paper writing dated the 30th day of January, 1924, purporting to be the last will and testament of Catherine Schmidt, deceased, and did he execute a release therefor to the executrix named in said alleged will with full knowledge of the amount and character of the estate of said Catherine Schmidt, deceased, and of his legal rights in and to said estate?"

In *Schmidt v. Johnston, supra,* this court laid down what a person, situated as Alfred is, must show in order for him to occupy the position of caveator of his mother's will, namely, that he must first show such facts as, standing alone, would make out a *prima facie* case of mental incapacity or undue influence; second, that he had no knowledge of such facts at the time he received the legacy and executed the release, and, third, that he was not put on notice of the existence of any such facts at that time. The facts which will constitute a *prima facie* case in such a situation must be not only such facts as are admissible in evidence in a caveat proceeding, but must be of sufficient probative force as would be

a legal basis for a finding by a jury invalidating the will. In other words, if, on the caveat proceedings, the evidence offered in a preliminary proceeding of this kind, standing alone, would necessitate the granting of a prayer directing a verdict for the defendant on the issues in that case, such facts are not sufficient to establish the would-be caveator's right to caveat the will. This is the clear and unmistakable effect of *Schmidt v. Johnston, supra,* and cases therein cited. It will be noted that the issues framed by the orphans' court in the case now under consideration did not comply with the requirement set out in *Schmidt v. Johnston,* in that they entirely omit the important factor that, in addition to the caveator's showing that he had no knowledge, he must also show that he was in such position that even had he exercised ordinary prudence and diligence, he could not have become acquainted with the facts now relied on. He must show not only that he did not know, but that by the exercise of ordinary diligence and prudence he could not have known. This omission in the issues, we think, is sufficiently supplied by the granted prayers. The answer of the jury to each of the issues of fact was "no", sustaining the right of the appellant to occupy the position of a caveator. From such ruling the appeal now before us was taken.

The record contains two exceptions, one to the ruling on evidence and the other to the action of the court on the prayers. The appellee's witnesses were himself, his wife, and his brother Edward. The appellee testified that he lived at 721 Appleton Street, Baltimore, almost directly across from his mother; that he had never visited or seen his mother for about three years prior to the day of her death, the reason being, according to him, that his mother and his wife did not get along together; that he first learned of his mother's extreme illness from the wife of his brother Walter on the morning she died; that he was requested to go there; that he went and saw his mother, who was still living; that, when he went to see her, he stood by her bedside and took her by the hand, and she said, "my boy, my boy", that is all she said;

then half an hour later she said, "I want you three boys to promise me you will look out for your sister"; that he had no knowledge of his mother's mental condition at the time of the execution of the will, until told by his brother Edward, which information was conveyed to him after his signing the release; that he went to his mother's funeral, and, the day succeeding, he, together with his brothers and sister, was present at the mother's home, when the sister produced his mother's will and he was requested by the others to read it; that he read it aloud, but did not fully understand its meaning and purport; that the kind and quantity of his mother's estate was not at that time discussed; that at the time the release was signed he was not told by anybody of the value of said estate; that he obtained this information in 1926, after consulting counsel.

The testimony of his wife has no value on the questions here at issue.

The testimony of the brother Edward is to the effect that previous to her last illness he had always made it a point to visit his mother at least once a week, except when he might be away on vacation during the summer; that her last illness continued for about five weeks; that, beginning three weeks before her death, for the first week he spent about two hours every other night with her, and the last two weeks of her life he visited her each night for about the same period; that she was well mentally and physically until the illness which resulted in her death; that about two weeks before his mother's death, on the occasion of one of his visits, the witness had a "terrible cold", "and she did whisper to me, she said or whispered to me, 'Take care of yourself, because I don't want you to die before I die,' she told me to take care of myself"; that during the last two weeks of his mother's illness his mother could do nothing for herself, and his sister had to do everything that was possible, wash her, give her meals and medicine, and attend to nature's wants; there was no one else at the house to do it. "Q. Will you tell us her condition just prior to January 30th? A. Well, from the two weeks that I had been going

down there my mother was failing very rapidly every day; my sister made a remark to me about eight or ten days before that her nails—she said, 'Did you notice how blue her nails were starting to get?' And she just laid there in a stupor like. She told me not to talk much to her because it would excite her. Q. How long would she lay in a stupor? A. I would say about eight to ten days. Q. How long was she in bed before she died? How many weeks? A. About five weeks. Q. Did you talk to her between January 28th and 29th and the day of her death, February 5th? A. No, sir. Q. Why? A. Because my sister said not to talk to her; not to make her talk. Q. Did she talk to you? A. No, sir. Q. You referred to her being in a stupor. Will you tell us whether or not that condition existed on January 29th and 30th, which was just a few days before her death? A. Yes, sir. (Objected to.) (The Court): When he mentioned she was in a stupor—— (Witness): I said about two weeks she was in that condition that she couldn't talk. Q. (By the Court): You mean when you saw her? A. Yes, sir; in the evening when I would go down. Q. During the two weeks you mean? A. During the last two weeks of her life. Q. (By Mr. Ward): Now, I will ask you to tell His Honor whether or not your brother Alfred visited your mother's home from say 1922— he said 1921 or 1922—to 1924 when she died? A. Yes, sir. Q. Do you know? Did he visit her? A. He hadn't visited her for a couple years. Q. Will you tell the jury of your observation of your mother within the last two or three weeks of her illness, particularly within the last eight or ten days when you say she was in a stupor? A. The last ten days—— Q. Wait a minute, let me finish the question. What you saw and observed of her condition as you described it. Will you tell us whether or not on January 30th, 1924, in your opinion, she was competent to make a last will and testament or a valid deed or contract? A. No, sir." This last question was objected to, and after argument, the objection was overruled and exception granted. The question was then repeated by the reporter and the witness answered that

he "would say positively no." Whereupon a motion was made to strike out the answer, which motion was overruled and exception noted. The witness further testified that he did not communicate the condition of his mother as of January 30th, 1924, to his brother Alfred until January, 1927; he was positive he had never told Alfred prior to that time; that he procured the services of counsel for his brother. On cross-examination he testified that, on the day of his mother's death, when his brother Alfred arrived, she looked at Alfred, recognized him, and told him it was "too late"; that she patted his hand and said, "my boy, my boy"; that later she told the three boys, "I want you all to promise me that you will look after your sister."

It will thus be seen that the first exception is to allowing Edward to express an opinion as to the mental capacity of his mother to execute a will or make a valid deed or contract on January 30th, 1924, and to the court's refusal to strike out the answer. This question has been passed upon by this court many times under varying circumstances, beginning in the case of *Townshend v. Townshend*, 7 Gill, 10, and contained in almost every report down to and including the case of *Cronin v. Kimball*, 156 Md. 489. From an examination of these numerous cases, it is firmly settled that an attending physician and the witnesses to a will are permitted to express an opinion as to the mental capacity of the testator without giving in evidence any facts upon which that opinion is based; that expert witnesses are permitted to express an opinion in answer to a hypothetical question, or after having heard the testimony in respect to the facts during the trial of the case. All other witnesses are forbidden to express an opinion without first giving the facts upon which the opinion is based, and then only in cases where the question is one of sanity or insanity of the testator. In addition, the facts related must be such as show the opinion of the witness to be a rational conclusion from those facts. In *Waters v. Waters*, 35 Md. 542, it was said: "It may be difficult to lay down any precise rules defining the basis on which such testimony ought

to rest." And in the *Berry Will Case,* 93 Md. 560, Judge McSherry, after quoting the above language from, *Waters v. Waters,* said: "Still there are some definite principles which, though they have in some instances been lost sight of or greatly relaxed, are nevertheless applicable to this class of testimony and ought not to be overlooked or further departed from when considering its admissibility. It has been distinctly ruled in this state, and is generally agreed, that mere opinion, unless it be the opinion of the subscribing witnesses to a will or the opinion of the medical expert, is not competent testimony to prove mental capacity or incapacity. It ought to appear that the witness had an opportunity of forming a rational opinion, and the facts deposed to by him ought to be such as in some manner to indicate the mental capacity of the testator, and to furnish to the witness rational ground for an opinion on that subject. Or, as expressed in *Townshend v. Townshend,* 7 Gill, 28, 'the impression made upon the mind of the witness by the conduct, manner, bearing, conversation, appearance and acts of the testator in various business transactions for a long period of years, is not mere opinion, it is knowledge.' This was quoted with approval in the recent case of *Crockett v. Davis,* 81 Md. 151. It is not strictly accurate to say that a nonexpert witness other than a subscribing witness may give his opinion as to a testator's mental capacity, though usage has sanctioned the expression. If he has the means of knowing what the mental condition is, then after disclosing those means so as to show both that he possesses them and that they are adequate, he may state the result, not as opinion, but as knowledge, precisely as he may do when questions of personal identity or of handwriting are involved. This result is, 'in its essence, only fact at shorthand.'. *Conn. Ins. Co. v. Lathrop,* 111 U. S. 620. There must be a basis shown for the formation of a rational conclusion which is not a mere conjecture, but is knowledge. Hence if that basis is trivial or insufficient, or does not furnish in the judgment of the court an adequate ground to support such a conclusion as amounts to knowledge, the witness should not be permitted

to express any conclusion at all. Facts must be stated so that it may be seen whether the conclusion deduced from them by the witness has any relation to or can be fairly said to be dependent on them." In *Struth v. Decker,* 100 Md. 368, Judge Pearce, after quoting the language of Judge Gaston in *Clary v. Clary,* 2 Iredell (24 N. C.) 78, to the effect that judgment founded on actual observation of the capacity, disposition, traits, and character of the person under consideration is more than mere opinion; that it approaches knowledge and is knowledge, so far as the imperfection of human nature will permit knowledge of these things to be acquired, and that the result thus acquired should be communicated to the jury because they have not had the opportunity of personal observation, and because in no other way can they effectually have the benefit of the knowledge gained by the observation of others, goes on to say: "But it must be taken in connection with the facts of the case in which the language was used. This is equally true of all the cases cited by the appellant upon this exception. Without referring specifically to the facts of these cases, it will be seen that in all of them the persons whose wills were questioned were in good physical condition, and the question was one of sanity or insanity, not a question of testatmentary capacity, dependent upon physical exhaustion merely, or the obscuration of the mental faculties upon the near approach of death. That the decision in the Maryland cases cited by the appellant, such as *Stewart v. Spedden,* 5 Md. 436; *Weems v. Weems,* 19 Md. 334; *Williams v. Lee,* 47 Md. 32; *Kerby v. Kerby,* 57 Md. 345; and *Jones v. Collins,* 94 Md. 409, clearly make this discrimination, will appear from reference to them; and the recent *Berry Will Case,* 93 Md. 579-580, confirms this discrimination. * * * In this case the basis is insufficient because the inquiry does not relate to the general capacity of the testator to be determined from habit, conduct, or demeanor, but to his physical condition suddenly induced by illness and dethroning his normal mental faculties. Under the circumstances of this case we think there was no error in this ruling."

The above ruling was on an exception raising the question as to when witnesses not medical experts or subscribing witnesses will be allowed to express an opinion as to the capacity of an alleged testator to make a valid deed or contract. The distinction indicated by this court in the earlier decisions, and re-affirmed in the case of *Struth v. Decker, supra,* is founded in reason and should be maintained and strictly adhered to, if frivolous will contests, without legal grounds to support them, are to be prevented, and the right to dispose of property by will is to be safeguarded. When the issue is one of sanity or insanity, or the question of whether the testator was competent or incompetent, over a long period, to execute a will, a lay witness who has had the opportunity and has become acquainted with the characteristics, habits, actions, conduct and demeanor, gained through various business transactions over that period, has knowledge, and his statement of the result of such an association is more than an opinion. His observation of and contact with the testator has resulted in fixing an impression in his mind as to the testator's mental capacity as certainly as the handwriting of one may become knowledge to another, or the identity of a person may be testified to as a fact. The many and varied incidents covering a period of years, which result in this knowledge, could not be expected to be given in detail by the witness, and therefore his impression, which this court has said amounts to knowledge, and is not mere opinion, is permitted to be given to the jury on such an issue. Even if in exceptional cases such a witness was able to give all the facts which resulted in the impression equivalent to knowledge, it would be improper to require it, because of the time such practice would necessarily involve. In such a case it is only necessary that the witness give what might be termed samples of the facts upon which he bases his conclusion, so that the court and jury may understand that it does not rest upon frivolous and inconsequential occurrences, but has a rational foundation. On the other hand, when the question is not one of sanity or insanity, but is one of incapacity shown to be due to the tem-

porary dethronement of the mental faculties by the administration of opiates, the obscuration resulting from the near approach of death, or the like, witnesses can, without difficulty and without consuming much time, state in detail the facts as they existed, which, when stated, place the jury in equally as advantageous position to determine the capacity of the testator as the witness could possibly be, and therefore the opinion of the witness amounts to no more than saying that if he were on the jury he would find that the testator had capacity or lacked capacity, as the case might be. Given the same facts, it is the jury's province, and not the witness', to reach a conclusion as to mental capacity. There is nothing in *Daugherty v. Robinson,* 143 Md. 259, and the other cases cited by the appellee, at all in conflict with the rule here followed. Without referring specifically to the facts of those cases, it is sufficient to say that in all of them the question related to the general capacity of the testator, to be determined from habit, conduct or demeanor, while here the inquiry is as to the physical condition of the testatrix, suddenly induced by illness and dethroning her mental faculties. *Struth v. Decker, supra; Birchett v. Smith,* 150 Md. 369.

The trial court granted plaintiff's prayers Nos. 3, 4 and 5; the first and second having been withdrawn. Plaintiff's third prayer is: "The court instructs the jury, that if they shall believe from the evidence in this case, that the plaintiff, Alfred G. Schmidt, at the time he accepted the sum of five hundred dollars as a legacy in his favor by a paper writing dated January 30th, 1924, and purporting to be executed by his mother, Catherine Schmidt, and executed a release to Marie Agnes Schmidt, the executrix named in said paper, on June 21st, 1924, did not at the time that he accepted said legacy and executed said release have full knowledge of the facts and circumstances relating to the mental capacity of Catherine Schmidt to execute a valid deed or contract, on January 30th, 1924, or reasonable time and opportunity with due diligence to have obtained the same, and that he did not procure said knowledge, or have said opportunity,

if the jury shall so find, until within a few months, that is, within a reasonable time prior to filing his petition for issues in the Orphans' Court of Baltimore, on February 10th, 1927, then the verdict of the jury shall be in favor of said plaintiff, and the answer to the first issue shall be "no", provided, however, the jury find from the evidence that there existed in the circumstances attending the making and execution of said will, any undue influence or mental incapacity of the testatrix, based upon the evidence in this case." The fourth prayer was similar to the above, except that it dealt with the question of undue influence practiced upon the testatrix; and the fifth was likewise similar, except it dealt with the plaintiff's lack of knowledge as to the amount and character of the estate of the deceased. The defendant filed special exceptions to each of the plaintiff's prayers, which special exceptions were overruled.

The ground of the exception to the plaintiff's third prayer is that there is no evidence that, at the time the plaintiff executed the release in question on June 21st, 1924, he could not have had full knowledge of the facts and circumstances relating to the mental capacity of Catherine Schmidt to execute a valid deed or contract on January 30th, 1924, by the exercise of ordinary diligence on his part; second, that there is no evidence in this case that at the time of executing the will Catherine Schmidt had not the mental capacity to make said will. The special exception to the fourth prayer was that there is no evidence in this case to show that any undue influence was exercised or practiced upon said Catherine Schmidt in connection with the execution of her will; and the special exception to the plaintiff's fifth prayer is, first, because there is no evidence that at the time the plaintiff executed the release he did not have full knowledge of the amount and character of the estate of Catherine Schmidt and his legal rights therein, or that he could not have had such knowledge by the exercise of ordinary care and diligence on his part. These special exceptions should have been sustained.

As stated in *Schmidt v. Johnston, supra,* and as embodied in the granted prayers of the plaintiff, it was incumbent upon the plaintiff to show not only that he did not have actual knowledge of the facts set out in the prayers, but that he was not put on such notice thereof, or occupied such position as would have enabled him, by the exercise of ordinary care and diligence, to discover those facts before he accepted the legacy and signed the release. The evidence of his mother's mental condition at the time of signing the will, which the plaintiff alleges he did not have when he signed the release, is confined to the testimony of his brother Edward. It is true that the plaintiff and his brother both testified that these facts were not communicated to the plaintiff until long after the release was executed, and, while the jury believed this, it is significant that it is all of the testimony upon which the plaintiff must rely to establish his right to caveat the will of his mother; and if such caveat be successful, the result would inure equally to the benefit of the brother Edward, although he is not in a position to caveat the will himself, because of his admitted knowledge of these facts at the time he signed his release. Edward's testimony is therefore properly the subject of closest scrutiny, because by such testimony, if successful in this case, he will not only remove the bar in respect to the plaintiff, occasioned by the release, but will himself benefit to the same extent, in spite of the fact that all of the knowledge, which he claims to have given to the plaintiff after the release, was had by him at that time.

But without regard to whether the plaintiff only acquired actual knowledge from his brother Edward after the signing of the release, it is indisputable that he was in a position to acquire knowledge of all the facts which he presents in this case from the time when he read the will, early in February, down to June 21st, the date of the release. From the day after his mother's funeral he knew that she had left a will, and its contents. Although he had not visited his mother for several years prior to her death, his sister was in constant attendance, and his two brothers were also in regular and fre-

quent contact with the mother. He is charged with the knowledge that the law gave him a right to caveat the will. It is not enough for him to say that his brother Edward or others did not volunteer the information as to the capacity of his mother to make a will, or the character and extent of her estate. ·This he could ascertain by the simple expedient of inquiring of those who had been in close contact with the deceased, but which he totally failed to do. The record discloses that he had been living for a number of years almost directly across the street from the home of his mother, and was in close contact with his brother Edward, they being together at the time of receiving their respective legacies, signing the release, and executing the deed to their sister. So it is apparent that he had at his command, for the first four and a half months after his mother's death, the same opportunities and sources of information which he only utilized long after the release was executed. All of the knowledge alleged to have been later acquired, as to his mother's mental condition, could have been gained without difficulty, without exertion, and without the expenditure of a dollar on his part. Under such circumstances he was bound to utilize the simple and effective means at his hand, and cannot be heard to say that, because the information was not voluntarily given him until after the signing of the release, he is exonerated from the reasonable requirement of exercising due diligence before that time.

From a careful examination of this record we cannot escape the conclusion that by the exercise of the slightest prudence and diligence the plaintiff could have acquired, at an effective date, all of the information which he now presents, and that he did not do so because he was satisfied with the provisions of his mother's will; that the cause of his present attitude is due, first, to the antagonism between his wife and sister, begun before and continued after his mother's death; and second, the marriage of his sister, which may result in his receiving less than he would have received had she remained single. The plaintiff states that he was under the impression

that the marriage of his sister, a thing which he had been "praying for", gave him an opportunity to contest the will; and then for the first time he sought and acquired knowledge of the facts upon which is based his right to occupy the position of caveator. Holding that permitting the brother Edward to express an opinion as to his mother's capacity to execute a valid deed or contract was erroneous, we have remaining his statement that she lay in a "stupor like" when he visited her the last ten days or two weeks of her life. He details statements made by his mother on two occasions, one before the execution of the will, in which she recognized that he had a severe cold and told him to take care of himself because she did not want him to die before her; and another, on the day of her death, when the plaintiff, after having been sent for, came into his mother's room, at which time she looked at him, recognized him, and said, "It is too late", then took the plaintiff by the hand and said, "My boy, my boy," and a few minutes later telling her three sons that she desired them to look out for their sister. On these two occasions the words and actions of the deceased show nothing irrational, but on the contrary, were those of a perfectly normal and mentally competent person. This testimony demonstrates that the deceased was not in a stupor on those occasions, and refutes the testimony or inference therefrom that she was in a continuous stupor during the last ten days or two weeks of her life. The testimony of the appellant is positive that on the occasion of each of the visits of Edward he talked to his mother and she talked to him in a perfectly rational manner.

Applying the test heretofore stated, that on the preliminary question the plaintiff must make out by competent evidence a *prima facie* case, we are of the opinion that the plaintiff has failed to meet this burden, and if the testimony which is legally admissible in this proceeding were the only testimony offered in a caveat proceeding the court should grant an instruction directing a verdict for the defendant. There is no evidence in the case which could by any possibility be sufficient to submit the issue of undue influence. Entertaining

the views herein expressed, it follows that the defendant's special exceptions to the plaintiff's third, fourth, and fifth prayers should have been sustained and that the defendant's second, fifth, and sixth prayers should have been granted. For the errors stated, the case must be reversed, without a new trial.

*Rulings reversed, and case remanded.*