JOHN D. SMEAK ET AL. *v.* GEORGE M. PERRY, EXECUTOR

[No. 47, April Term, 1938.]

74

*Decided June 14th, 1938.*

The cause was argued before URNER, OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Henry Vogt,* for the appellants.

*Malcolm J. Coan* and *Paul B. Mules,* for the appellee.

JOHNSON, J., delivered the opinion of the Court.

This is an appeal from rulings made by the Circuit Court for Baltimore County upon the trial of issues framed in the Orphans' Court for that county, and transmitted to the Circuit Court, relating to the validity of a paper writing purporting to be the last will and testament of Helen M. Perry, late of Baltimore County, deceased. The issues were three in number, the first relating to the *factum* of the will, the second as to whether it was understood by the testatrix at the time of its execution, while the third submits the question as to whether it was procured by undue influence.

The caveators, John D. Smeak and Mary S. Karsten, brother and sister of the decedent, were designated as plaintiffs, and George M. Perry, the caveatee, surviving husband of Helen M. Perry, who under the alleged will is sole legatee and executor, was named defendant. After testimony had been offered on behalf of both parties, the court granted instructions relating to each issue, directing the jury to answer "no."

Since, for the purpose of determining the correctness of the trial court's action upon the prayers, the truth of the evidence offered by the caveators must be assumed, a brief review of that evidence becomes necessary.

Helen M. Perry and George M. Perry were married in 1932. No children were born to them from the marriage, subsequent to which they did not at first live together.

There is some suggestion that this was due to a desire to keep the marriage a secret from the wife's father, who looked upon it with disfavor. However, he later learned of it, and while there is no testimony to show that he changed his will after acquiring that information, yet by that document he left one-third of his estate to the Colonial Trust Company as trustee, to pay the income therefrom to Mrs. Perry for life, the corpus upon her death to be divided equally between her brother and sister. Her income from this fund was approximately $75 per month, and her estate consists of a house and lot, and some household furniture contributed by her father during his lifetime, the present value of which is approximately $10,000.

In May, 1937, Mrs. Perry's physician discovered she was suffering from tuberculosis, and in the early part of June, upon his advice, she entered the Maryland State Tuberculosis Sanitorium at Sabillasville. From that time her condition grew steadily worse until her death, which occurred at her home in Baltimore County on August 7th, where she had been taken by her husband nine days earlier. Her removal by the husband from the sanitorium to the home was not made upon the advice of her family physician or the physicians at the sanitorium, not one of whom was consulted regarding it, and the evidence is susceptible of an inference that, in taking this course, the husband had learned that on July 17th, she had executed a last will and testament, by the terms of which he was left but one-half of her estate, and the remaining one-half was divided between these appellants. There is evidence to the effect that after having received the draft of that will she considered it carefully, and upon its execution expressed herself as being well pleased with it.

The married life of Mr. and Mrs. Perry was filled with numerous quarrels and disputes, and early in 1937 she, apparently because of those differences, spent at least one week in the home of a neighbor. Her relations with her sister, Mrs. Karsten, had always been intimate, but, after her marriage to Perry, things were so unpleasant

in her home that she saw her sister only by meeting her at other places, and, on various occasions when she met the sister, she complained that Perry, her husband, argued with her all the time about her money; that he was not supporting her, but she supported him until she entered the sanitorium, and that the husband did not approve her decision in consulting her physician, who, as a result of the examination he then made, advised that she enter the sanitorium. Mrs. Perry at times, although living in her home, requested the sister not to address letters there, but to send them to one of her neighbors.

Mrs. Karsten, the sister, received a letter from Mrs. Perry written August 27th, 1935, and another dated September 1st, 1935. In the first letter Mrs. Perry stated that her husband was very angry with her because she only gave him 75 cents; that he had come home on Sunday and said he wasn't going to return, so the following day she consulted counsel, who had told her what to do. She then wrote, "So I am waiting for the next time, I think it will be this week, or maybe today. He is boiling. I am going to tell him to get out, or go up to the station house. He can take his choice." On the postscript of that letter, she stated she was over at Hobbs' (her neighbors) and the husband was liable to come there any time and "slam me one." From the second letter we quote: "This week has been a 'Hell on earth' for me. He would come in my room at night and tell me was going to break everything in the place—bust my face in and cut my throat before he left, all kind of things. Didn't notice him all week, makes him boil and then he does the 'devilment.' On his good behavior now, but he'll break out again and then as Henry V—said 'I'll go up and get out a warrant—and afterwards he can start to work.' I weighed 113—lost 10 lbs. this week, I believe—my nerves were terrible. Had Mrs. Hobbs worried, wanted to call you up, but I said you couldn't do anything. If I don't get rid of him I will lose my mind or kill him."

In December, 1935, she wrote her brother, John D.

Smeak, and in referring to her husband used this language: "He has always been a trouble maker, and he will do his best to try and make it for me. I wish I could sell the house, even put it in Mary's name, but I can't. If he would only make it unpleasant for me, I wouldn't care. I couldn't stay home after that night and I couldn't expect Mrs. H. to keep me all the time. I know Mary isn't keen on it, so I guess I will have to go back next week, but I sure don't feel safe especially at night, but I will just have to make out the best I can."

About the same time she filed a bill of complaint in the Circuit Court for Baltimore County against her husband, charging him with having attacked and brutally beaten her to such extent that she feared for her life and was obliged to remain away from her home; that such misconduct on the part of the husband had recurred so frequently there was no hope that his conduct would improve; that he had failed to support and provide her with the necessities of life and actually deserted and abandoned her. In that bill she prayed to be divorced *a mensa et thoro* from him. Three successive subpoenas were issued thereon, as to each of which the return was *"non est,"* and finally she returned to her home. However, from that time until she entered the sanitorium, whenever with her sister, Mrs. Karsten, she always complained at her husband's conduct toward her, and on many occasions between the date of her marriage to Perry and July 4th, 1937, she made the statement that she did not desire her husband to have any share of her estate in excess of the amount allowed him by law.

There was also evidence that, notwithstanding his wife had entered the sanitorium early in June, Perry did not visit her until July 25th, four days before he removed her to her home in Baltimore County. From the time of her arrival until her death, which occurred about one week later, her condition was most critical, the disease with which she was suffering having advanced to such stages that she was nothing but "skin and bones," constantly confined to bed and unable to move. Her sister,

after securing permission from the husband, visited her on the morning of July 30th, and described her as "just a shadow," and her testimony is susceptible of an inference that as a result of weakness she was unable to talk without great effort. On that occasion the sister stated that Perry, the husband, did all the talking. He asked the wife in her presence, "Who brought you from the hospital," and Mrs. Perry answered, "You did." He then asked, "who put you in the wheel chair," and other similar questions, to each of which the same reply was made; that when the husband left the room the wife remarked, "He sets me crazy." Mrs. Perry requested that, when her sister was prepared to deliver to her the money from the trust company, not to give it all to her as her money had been going very fast since her return home. On the following day Mrs. Perry requested that she not let her husband see her sign the receipt, but Perry entered the room just as his wife signed it, and began talking about the will his wife had made while at Sabillasville. An argument then ensued between him and the sister-in-law, who told Perry that on the New Year's Eve previous his wife could not return home because he had struck her, and the wife then repeated to the husband that the statement was true. Mrs. Karsten not only accused Perry of having treated her sister brutally, but of bringing her home in a very serious condition in order to get possession of her property.

Decedent's brother, Smeak, who resides in Greenville, South Carolina, arrived in Baltimore on August 5th, and went straight to his sister's bedside. On that occasion he quoted her as having said, "Oh, Buzzy, Buzzy, I have treated you and Susie badly," the word "Susie" having been used by her to refer to Mrs. Karsten; that he requested her not to worry about that, to which she replied, "Oh, but I can't help it." This statement was made within two days from the time of the execution by Mrs. Perry of the will here attacked, for although it was undated save for "August —, 1937," witnesses fixed the date of its execution as the third or fourth of that month.

While Mrs Perry was confined in the sanitorium, a part of her home was occupied by Joseph T. Hinton and his wife, Anna C. Hinton, who were witnesses to the second will. Some reference should be made to the testimony given by them. Mrs. Hinton stated that shortly before its execution she was out in the yard and was requested by Perry to enter his wife's room and witness her will. Her husband was also present; that she asked Mrs. Perry if she really wanted her to sign as a witness and received the reply, "Yes, sign it and get it over with." She later stated that decedent said, "Sign that so I can get it over with and have some peace." The paper writing referred to by the witness was produced by Perry, the husband, but nothing was shown as to who prepared it, nor that instructions for its preparation were given by Mrs. Perry. Mrs. Hinton admitted that after having entered the room at Perry's request she withdrew. He and his wife were then alone and she did not return until sent for; that she remained in the kitchen "a few minutes" before being requested to return. She further stated that, after Mrs. Perry had been returned to the home and before this occurrence, she would often hear loud talking while the husband was in the room, and on such occasions, after he would leave, she upon entering found Mrs. Perry crying and upset, and that Mrs. Perry told her on such occasions that the husband had been constantly worrying her to make another will; that this statement was made by Mrs. Perry just before the execution of the will in question, and that shortly before that time Perry, the husband, had stated to her that he had "finally got her to see the light," and she was going to make another will.

John D. Smeak testified that this witness, on August 6th, in a conversation with him relating to the execution of the alleged will, quoted Mrs. Perry as then having said "sign the G—— D—— thing, give him what he wants and let me die in peace." When questioned in regard to this, the witness failed to deny that such language was in fact used by Mrs. Perry. She said, "Something sim-

ilar to the words, sign so I can get it over with and have some peace."

John T. Hinton, after testifying that he and his wife signed the paper as witnesses, at Mrs. Perry's request, after she herself had signed it, gave this testimony on cross examination: "Q. What language did Mrs. Perry use in requesting your wife to sign, if any? A. I really can't say to that. I have heard what you say, but I know nothing about that, to tell you the truth, only that she asked that we be sent in, I heard that from the outside. Q. Answer the question? A. I could not say that, that she asked us to sign the will. Q. Would you say that statement was not made? A. No, I do not. Q. You would not say it was not made? A. No, I would say I never heard it though. Q. The statement I refer to is this: * * * it has not been brought out in your examination—Mrs. Perry said to the other witness, your wife, 'Sign the G—— D—— thing.' (Objected to.) Q. You say, you do not say that statement was not made? A. I didn't hear it. Q. Is this the statement you refer to, that the deceased said to the other witness, Mrs. Hinton, your wife: 'sign the G—— D—— thing, give him what he wants and let me die in peace'. (The Court) Do you understand that? (The Witness) I understand it. Q. Did that take place? A. Not that I know of. Q. Answer yes or no? A. No, in my estimation. Q. You were there and ought to know. A. No, I don't. Q. You say you can't say whether it was said or not? A. I never heard it, if it was: I say 'No' to the question. Q. Did your wife hesitate before she signed? A. I don't think so, no. Q. Are you sure about that? A. Well, it has been a little while ago, but I know we were there and signed it, that is the best answer I can give you to that, my wife was a little nervous herself. Q. Are you certain about the other question, what Mrs. Perry said to your wife, you are not certain about that? A. I can only answer you 'No,' that is for myself. Q. Now as to whether or not your wife hesitated in witnessing this will, what is the answer to that? A. I don't think so. Q. You don't think so? A. No. Q. Then you are not certain about that, are you? A. I am not, no."

At the close of the plaintiff's case, the same witness was called by the defendant, and the testimony which he gave was all that was offered by appellee. It is to the effect that before signing the alleged will as a witness he had a conversation with Mrs. Perry. This, it seems, took place shortly after the altercation between Mrs. Karsten and her brother-in-law heretofore referred to. In minute detail, Hinton told of having gone to Mrs. Perry's room with his wife. At that time Mr. and Mrs. Perry, Hinton and his wife, were present, and at his request Perry and Mrs. Hinton left the room in order, as he contends, for him to interrogate Mrs. Perry, since he himself desired to know full details regarding what disposition she wished to make of her estate. He quoted her as having said that she desired to make a new will; that she had had her "eyes opened to a few different things and wanted to leave everything to George, her husband." Continuing, he related that he questioned her specifically if she knew what she was saying and if she was subject to "any influence on either side one way or the other"; that he told her, "You are talking to me and not to anybody else. You are not talking to your family or your husband," and she replied, "No, Joe, that is what I want to do." He stated that he advised her to "think it over carefully," as he was trying to get at the bottom of it himself so that he might possibly "help out," and Mrs. Perry told him there was no influence on either side, and it was her desire that a will be made leaving everything to "George, Mr. Perry." It may here be stated that Perry, the husband, makes no denial whatever of the unpleasant relations which it was testified had existed between him and his wife from the time of their marriage until after she had been returned from the sanitorium to her home, nor is any denial made that she had, previous to this ocasion, expressed herself as being desirous, first of putting the home in the name of some one else, and in any event that she wanted him to have no more of her estate than the law would allow him, but that the testimony of this witness is relied upon as establishing

conclusively that, regardless of their prior attitudes toward each other, Mrs. Perry, as death approached, had become reconciled with her husband to such an extent that she desired him to be the sole beneficiary of her estate. This witness for fifteen years had been a street car conductor, and there is nothing in the testimony to show how long, if at all, prior to her return from the sanitorium, he had known Mrs. Perry, and how, even if he had become interested in the disposition of her estate, his training would have enabled him to manifest that interest by asking her such questions as only a skilled lawyer or some one with a knowledge of the law might suggest. We are not intimating that the jury could not, if it believed what he said, have arrived at the conclusion that no undue influence had in fact accounted for the disposition which she made of her property at that time, and this becomes apparent when we consider that, according to his statement, no one except himself was present to verify or deny that Mrs. Perry made the statements attributed to her. But the action of the trial court in instructing the jurors to answer "no" to the issue relating to undue influence deprived them, not only of passing upon the credibility of this witness, but of those offered by appellants.

It is shown that Hinton was a close personal friend of the sole beneficiary named in the alleged will, and the fact that, according to his version, his interest was such as to cause him of his own accord to question her in private regarding the disposition she wished to make of her entire estate, plus his equivocation in answering questions pertaining to statements made by Mrs. Perry at the time she signed that document, are all matters that must be considered by the jury in its determination whether it will believe Hinton's story as to what Mrs. Perry had told him. Therefore, if the evidence offered by the appellants was susceptible of a rational inference that the alleged will was not the free and voluntary act of Mrs. Perry, but the result of undue influence practised upon her, amounting to coercion, the trial court was

not justified in directing that the issue relating thereto be withdrawn from the jury's consideration.

In discussing fraud and undue influence, Mr. Bagby, on page 39 of his work, *Maryland Law of Executors & Administrators*, summarizes as follows:

"Under the circumstances of some cases, 'the results accomplished, the divergence of those results from the course which would ordinarily and naturally be looked for, the situation of the party taking benefits under a will towards the person who has executed it, and their antecedent relations to any dealings with each other, the legitimate but unrecognized claims of others upon the bounty of the testator and their dependents upon him, the instincts of justice of which every unbiased mind is sensible, the natural ties of parental affection, together with all the circumstances surrounding the transaction under investigation, and the inferences legitimately deducible from them, often furnish in the absence of direct evidence (which from the very nature, and secrecy of the wrong itself is rarely obtainable), ample ground for the conclusion that undue influence has been used to accomplish an end which may be gross in its injustice and whose very existence cannot be satisfactorily accounted for, except upon the hypothesis that undue influence has produced it.' The character and degree of the influence exerted involve necessarily to some extent the testator's physical and mental condition when the will was executed. The influence that would be unlawful if exerted upon one advanced in years and in declining health, of a weak and vacillating will, might be altogether unavailing with one in robust health and of a firm and robust purpose. Undue influence is generally proved by a number of facts, each one of which standing alone may be of little weight but which taken collectively may satisfy a rational mind of its existence. In order to invalidate a will the undue influence need not have been exercised at the immediate time of its execution but such influence must have been in force and effective then."

See authorities there referred to, also *Donnelly v.*

*Donnelly,* 156 Md. 81, 143 A. 648; *Mead v. Gilbert,* 170 Md. 592, 185 A. 668; *Davidove v. Duvall,* 160 Md. 345, 153 A. 417; *Acker v. Acker,* 172 Md. 477, 192 A. 327.

Tested by these principles, we are of the opinion that the trial court committed error in directing that the jury answer "no" the third issue, relating to undue influence.

Mrs. Perry's estate had been acquired from her father and was in no way augmented by her husband. Moreover, the relations between her and her husband had throughout their married life been so strained that she entertained a fixed purpose and desire to deprive him of any interest in her estate, except that to which he was legally entitled, and this purpose and plan, according to the plaintiffs' evidence, existed even after she had been returned to her home. Under such circumstances, her desire that her brother and sister, with whom she had always been on friendly terms, share in her estate cannot be characterized as unnatural or unjust. Moreover, her removal by the husband to her home, against her will, on the eve of her death, with the knowledge of the will dated July 17th, and a desire on his part that it be changed, that he, on several occasions, while she was in an extremely weakened physical condition, had discussions with her, at the conclusion of which Mrs. Hinton upon entering her room found her crying, that decedent at such times complained that the husband was trying to get her to change her will, his subsequent statement that he "finally got her to see the light," that the will was changed shortly thereafter, and, by its terms, her husband was left her entire estate, are matters which, if believed by the jury to be true, might well have enabled them to reach a rational conclusion that the will here questioned was the result of his undue influence.

Since the conclusion we have reached respecting the legal sufficiency of the evidence on the issue of undue influence will necessitate a reversal and a retrial of the case, we deem it proper to express our views upon the first nine exceptions, which relate to rulings upon the admissibility of evidence. The first of these was taken

to the trial court's action in sustaining an objection to a question asked Mrs. Hinton on cross-examination as to what she told Mrs. Karsten on the night of August 5th with respect to Mr. Perry getting his wife to make another will. There was no error in this ruling. If the purpose of the question propounded was to impeach the witness, it was improper, for the reason that no sufficient foundation had been laid, and no other ground is assigned in support of the contention that the ruling was erroneous. The second, sixth, seventh and ninth exceptions relate to questions propounded certain witnesses as to their knowledge of a quarrel or disturbance at Mrs. Perry's home on the night of August 5th. The objections were properly sustained, first, because they were immaterial, second, for the reason that whatever occurred on this occasion must have taken place subsequent to the execution of the will in question, and could, therefore, throw no light on the issue. The third, fourth and fifth exceptions were taken to the refusal of the trial court to permit Doctor Fort, Mrs. Perry's personal physician, to describe her physical condition on August 3rd, 4th and 6th. In the opinion of this court, the inquiries were proper and the questions should have been allowed, since the physical condition of the testatrix had an important bearing upon her susceptibility to undue influence. *Bagby, Maryland Law of Executors & Administrators, supra; Griffith v. Benzinger,* 144 Md. 575, 125 A. 512.

Smeak, decedent's brother, after testifying that his sister had told him that she had treated him and Susie badly, was asked this question, "What did you understand that to be?" To the refusal of the court to permit that question to be answered, the eighth exception was taken. The ruling was proper. The witness had been permitted to state the entire conversation between himself and the decedent, and it became the function of the jury and not the witness to characterize it.

The first and second issues which related to the *factum* of the will and decedent's knowledge of its contents, respectively, were by instructions granted at the request

of the caveatee answered "no" by the jury. Since there was no legally sufficient evidence offered by the caveators to justify the submission of such issues to the jury, those instructions were proper.

*Rulings reversed.*